EXHIBIT "B"

STOCK COMPANY                    COMMERCIAL LINES POLICY

**Western World**
INSURANCE GROUP

POLICY NUMBER: GRL5000034

Prior Policy Number: NEW

[X] WESTERN WORLD INSURANCE COMPANY   [ ] TUDOR INSURANCE COMPANY   [ ] STRATFORD INSURANCE COMPANY

**COMMON POLICY DECLARATIONS**                    Agent/Broker #16184

Named Insured and Mailing Address:
**Professional Collection Consultants**

6700 S. Centinela Blvd. 3rd floor

Culver City, CA 90230

Producer:
**U.S. Risk Pro**
**1551 N Tustin Ave**

Santa Ana, CA 92705

**Policy Period: (Mo./Day/Yr.)**
From: 02/17/2014        To: 02/17/2015        12:01 AM, standard time at your mailing address shown above.

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE
AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

THIS POLICY CONSISTS OF THE FOLLOWING COVERAGES FOR WHICH A PREMIUM IS INDICATED.
THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.

| | | |
|---|---|---|
| | Commercial Property Coverage Part | $ NOT COVERED |
| | Commercial General Liability Coverage Part | $ NOT COVERED |
| | Commercial Auto Coverage Part | $ NOT COVERED |
| | Directors and Officers Coverage Part | $ 13,799.00 |
| | | $ |
| | | $ |
| Other Coverages: | Terrorism Risk Insurance Act | $ INCLUDED |
| | | $ |
| | | $ |
| | | $ |
| | TOTAL ADVANCE PREMIUM | $ 13,799.00 |
| | SL Tax | $ 413.97 |
| | SL Stamping Fee | $ 27.60 |
| | | $ |
| Forms and endorsements applying to this policy and attached at time of issue: | | $ |
| | | $ |
| See Applicable Schedule Of Forms And Endorsements | | |
| | GRAND TOTAL | $ 14,240.57 |

Page 1 of 2
COMPANY                                                                    WW230 (09/11)

WW 000016

RENTKO DEC - EXHIBIT B
Page 000019

COMMON POLICY DECLARATIONS (continued)

POLICY NUMBER: BRL8000034

The Named Insured is:

☐ Individual   ☐ Partnership   ☐ Limited Liability Company   ☒ Organization/Corporation   ☐ Trust

☐ Other _____

**Location of Business:**
6700 S. Centinela Blvd , 3rd floor
CULVER CITY, CA 90230

**Business Description:**
FOR PROFIT ENTITY

THESE DECLARATIONS TOGETHER WITH THE COVERAGE PART DECLARATIONS, THE COMMON POLICY
CONDITIONS, COVERAGE FORM(S), AND FORMS AND ENDORSEMENTS, IF ANY, COMPLETE THE ABOVE NUMBERED
POLICY.

## WESTERN WORLD INSURANCE GROUP

Western World Insurance Company
Tudor Insurance Company
Stratford Insurance Company

Administrative Office
400 Parson's Pond Drive
Franklin Lakes, New Jersey 07417-2600

We will provide the insurance described in this policy in return for the premium and compliance with all applicable
provisions of this policy. If required by state law, this policy shall not be valid unless countersigned by our authorized
representative.

Secretary                                      President

| Countersigned: | | By | |
|---|---|---|---|
| 03/10/2014   RENTKOGR | | | Authorized Representative |

Page 2 of 2                                      WW290 (08/11)

WW 000017

RENTKO DEC - EXHIBIT B
Page 000020

## SCHEDULE OF FORMS AND ENDORSEMENTS

| POLICY NUMBER:<br>BRL8000034 | NAMED INSURED<br>Professional Collection Consultants |
|---|---|

Form/Endorsement No./Edition Date        Title   (Note- Titles are indications only. See actual form for correct name.)

```
WW230(08_11)        COMMON POLICY DECLARATIONS
WW22(02_13)         SERVICE OF SUIT
IL0017(11_98)       COMMON POLICY CONDITIONS
D-2(07_11)          CALIFORNIA NOTICE
WWCA01(12_11)       CALIFORNIA DISCLOSURE NOTICE PREMIUM REFUND
DEL02(10_11)        DIRECTORS OFFICERS INSURED ENTITY DECLARATIONS
DEL01(02_12)        DIRECTORS OFFICERS INSURED ENTITY COVERAGE FORM
DEL16(01_11)        PAYMENT OF DEFENSE COSTS REDUCES LIMITS OF INSURANCE
DEL17(03_10)        ASBESTOS EXCLUSION
DEL19(03_10)        POLICYHOLDER DISCLOSURE NOTICE OF TERRORISM INS CVG
DEL56(07_12)        BACKDATED PENDING AND PRIOR LITIGATION EXCLUSION
DEL74(10_11)        SHARED LIMITS ENDORSEMENT
DEL76(10_11)        PRIVATE COMPANY LIMITATION ENDORSEMENT
DEL88(10_11)        RELIANCE UPON ANOTHER'S APPLICATION ENDORSEMENT
DEL94(07_12)        EXTENDED REPORTING PERIOD ENDORSEMENT
DEL98(06_13)        SETTLEMENT AMENDATORY ENDORSEMENT
DEL100(08_13)       PENSION TRUST LIABILITY EXTENSION SHARED LIMIT
DEL102(08_13)       CRISIS MANAGEMENT ENDORSEMENT
```

ADDITIONAL FORMS AND ENDORSEMENTS

COMPANY

WW 000018

RENTKO DEC - EXHIBIT B
Page 000021

# DIRECTORS, OFFICERS, INSURED ENTITY AND EMPLOYMENT PRACTICES INSURANCE COVERAGE PART

## THIS IS A CLAIMS MADE AND REPORTED COVERAGE

## DECLARATIONS

POLICY NUMBER:  BRL8000034

**Policy Period: (Mo./Day/Yr.)**

From:  02/17/2014     To:  02/17/2015      12:01 AM, standard time

### COVERAGE A. DIRECTORS AND OFFICERS LIABILITY INSURANCE

ITEM 1.  LIMIT OF INSURANCE

Aggregate Limit                                    $ 1,000,000

ITEM 2.  RETENTION (EACH CLAIM)                    $ 15,000

ITEM 3.  PREMIUM FOR COVERAGE A.                   $ 13,769.00

IF THERE IS NO LIMIT OF INSURANCE SHOWN FOR ITEM 1., THIS POLICY
DOES NOT INCLUDE COVERAGE A. DIRECTORS AND OFFICERS LIABILITY INSURANCE.

### COVERAGE B. EMPLOYMENT PRACTICES LIABILITY INSURANCE

ITEM 4.  LIMIT OF INSURANCE

Aggregate Limit                                    $ 1,000,000

ITEM 5.  RETENTION (EACH CLAIM)                    $ 50,000

ITEM 6.  PREMIUM FOR COVERAGE B.                   $ 0.00

IF THERE IS NO LIMIT OF INSURANCE SHOWN FOR ITEM 4., THIS POLICY
DOES NOT INCLUDE COVERAGE B  EMPLOYMENT PRACTICES LIABILITY INSURANCE.

### TOTAL COVERAGE PART PREMIUM

Terrorism Risk Insurance Act of 2002 Premium       $ 0

ITEM 7.  TOTAL COVERAGE PART PREMIUM               $ 13,769.00

### ITEM 8.  FORMS AND ENDORSEMENTS

Forms and Endorsements applying to this Coverage Part and made part of the Policy at time of issue:

SEE SCHEDULE OF FORMS AND ENDORSEMENTS AND

THE INSURED'S APPLICATION FOR THIS INSURANCE.

THESE DECLARATIONS ARE PART OF THE POLICY DECLARATIONS CONTAINING THE NAME OF THE INSURED AND THE POLICY PERIOD.

DEL 02 (10/11)

WW 000019

RENTKO DEC - EXHIBIT B
Page 000022

# DIRECTORS, OFFICERS, INSURED ENTITY AND EMPLOYMENT PRACTICES INSURANCE COVERAGE FORM

NOTICE: This is a Claims Made and Reported Coverage Form.

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Common Policy Declarations. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any "individual insured" or "organization".

Other words and phrases that appear in quotation marks have special meaning. Refer to Section II - Definitions.

In consideration of the payment of the premium and reliance upon the statements made and information furnished to us as part of the "application", and subject to all the provisions of this policy, we agree to provide the insurance described in this Coverage Form and its applicable endorsements.

## SECTION I - INSURING AGREEMENTS

1. **Coverage A. Directors and Officers Liability**

   We will pay on behalf of the insured all "loss" that the insured becomes legally obligated to pay because of a "claim" first made against the insured during the policy period for "wrongful acts":

   a. Arising solely out of the "individual insured's" performance of his or her duties on behalf of the "organization"; or

   b. Attributed to the "organization".

2. **Coverage B. Employment Practices Liability**

   We will pay on behalf of the insured all "loss" that the insured becomes legally obligated to pay because of a "claim" first made against the insured during the policy period for "wrongful employment acts" or "third party wrongful acts":

   a. Arising solely out of the "individual insured's" performance of his or her duties on behalf of the "organization"; or

   b. Attributed to the "organization".

3. **Claims Made and Reported**

   The insured must, as a condition precedent to coverage, report any "claim" to us as soon as practicable, but in no event later than 60 days after the expiration of the Coverage Part.

4. **Defense**

   a. We have the right and duty to defend the insured against any "claim" to which this insurance applies, even if the allegations of the "claim" are groundless, false or fraudulent. However, we will have no duty to defend the insured against any "claim" to which this insurance does not apply.

   b. "Defense costs" are payable in addition to the applicable Aggregate Limit of Insurance.

   c. Our right and duty to defend any "claim" ends when we have used up the applicable Aggregate Limit of Insurance in payment of "loss".

   d. We are not obligated to pay "defense costs":

      1) Incurred prior to "claim" notification; or

      2) To which we have not consented.

5. **Coverage Extensions**

   a. **Spousal Provision**

      This insurance also applies to the lawful spouse or "domestic partner" of an "individual insured", but only for "claims" arising out of any "wrongful acts", "wrongful employment acts" or "third party wrongful acts" of the "individual insured".

   b. **Worldwide Provision**

      This insurance applies to "wrongful acts", "wrongful employment acts" or "third party wrongful acts" occurring anywhere in the world provided the "claim" is first made against an insured in the United States of America (including its territories and possessions), Puerto Rico or Canada.

   c. **Outside Directorship**

      This insurance applies to "individual insureds" who hold an official position as a director in another nonprofit entity but only if it is with your specific, written permission. The nonprofit entity must qualify as such under Section 501 (c) of the Internal Revenue Code of 1986 (as amended). Exclusion 19. Other Capacity does not apply for the above situation. This coverage will be excess of any other insurance available to the "individual insured".

DEL 01 (02/12)

WW 000020

RENTKO DEC - EXHIBIT B
Page 000023

---

**SECTION II – DEFINITIONS**

1. **"Application"** means:

   a. An application, whether it is ours or another's, and any material submitted for this coverage; and

   b. Any application and materials submitted for all the previous policies issued by us providing you continuous coverage until the effective date of this policy.

2. **"Claim"** means:

   a. A written demand for monetary relief received by an insured seeking to hold the insured responsible for a "wrongful act", "wrongful employment act", or "third party wrongful act" including, but not limited to, the service of suit or the institution of arbitration or mediation proceedings against the insured;

   b. A judicial or administrative proceeding initiated against an insured seeking to hold the insured responsible for a "wrongful employment act" or a "third party wrongful act", including any proceeding conducted by the Equal Employment Opportunity Commission or similar federal, state or local agency and any appeal therefrom;

   c. A written demand for non-monetary or injunctive relief received by an insured seeking to hold the insured responsible for a "wrongful act", "wrongful employment act", or "third party wrongful act" including, but not limited to, the service of suit or the institution of arbitration or mediation proceedings against the insured;

   d. A civil proceeding against any insured seeking monetary damages or non-monetary or injunctive relief, commenced by the service of a complaint or similar pleading;

   e. A criminal proceeding against any insured, commenced by a return of an indictment or similar document, or receipt or filing of a notice of charges;

   f. A civil, administrative or regulatory proceeding against any insured commenced by the filing of a notice of charges or similar document;

   g. A civil, criminal, administrative or regulatory investigation commenced by the service upon or other receipt by any "individual insured" of a written notice, investigative order, or subpoena from the investigating authority identifying such "individual insured" as an individual, against whom a proceeding described in paragraphs c., d., or e. immediately above may be commenced; or

   h. A written request of the insured to toll a statute of limitations relating to a "claim" described in paragraphs a. through g. immediately above.

A "claim" will be considered first made when an insured or its legal representative or agent first receives written notice of a "claim". If more than one "claim" arises out of the same "wrongful act", "wrongful employment act" or "third party wrongful act", or if an "interrelated claim", we will consider all the "claims" to be first made on the date the earliest of the "claims" was made.

3. **"Construction defect(s)"** means any actual or alleged defective, faulty, or delayed construction or any other matter constituting a construction defect under applicable law, regardless of whether it results from:

   a. Defective or incorrect architectural plans or other designs;

   b. Defective or improper soil testing;

   c. Defective, inadequate or insufficient protection from subsoil or earth movement or subsidence;

   d. Construction, manufacture or assembly of any tangible property;

   e. The failure to provide or pay for any construction-related goods or services; or

   f. The supervision or management of any construction-related activities.

4. **"Defense costs"** means reasonable and necessary fees, costs and expenses resulting from the defense and appeal of any "claim" against the insured, excluding salaries and bonuses of the "organization's" officers or "employees". "Defense costs" includes premiums for any appeal bond, attachment bond or similar bond.

5. **"Discrimination"** means:

   a. The termination of an employment relationship; or

   b. A demotion or failure to hire or promote an individual; or

   c. Any other limitation or classification of an "employee" or applicant for employment which would deprive any individual of employment opportunities or adversely affect any individual's status as an "employee",

   because of race, color, religion, age, sex, disability, pregnancy, national origin, marital status, sexual orientation or other protected class or characteristic established under applicable federal, state or local statute, ordinance, regulation or order.

6. **"Domestic partner"** means any natural person qualifying as a domestic partner under the provisions of any applicable federal, state or local law.

7. **"Employee"** means any natural person whose labor or service is engaged by and directed by the "organization" while performing duties related to the conduct of the "organization's" business. "Employee" includes leased, part-time, seasonal and temporary workers, volunteers and interns.

DEL 01 (02/12)

WW 000021

RENTKO DEC - EXHIBIT B
Page 000024

8. **"Harassment"** means:

a. Sexual harassment, including unwelcome sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature, that is made a condition of employment, is used as a basis for employment decisions, or creates a work environment that is hostile, intimidating or offensive or that otherwise interferes with performance; or

b. Other harassment which creates a work environment that is hostile, intimidating or offensive or that otherwise interferes with performance.

9. **"Individual Insureds"** means any person(s) who were, now are, or will be directors, trustees, officers, "employees", or committee members of the "organization", including their estates, heirs, legal representatives or assigns in the event of their death, incapacity or bankruptcy.

10. **"Interrelated claims"** means all "claims" based upon or arising from "wrongful acts", "wrongful employment acts," or "third party wrongful acts" that have in common any fact, circumstance, situation, event, transaction, cause or series of causally or logically connected facts, circumstances, situations, events, transactions or causes.

11. **"Loss"** means damages and settlements which an insured is legally obligated to pay as a result of a "claim" for a "wrongful act" or "wrongful employment act", or "third party wrongful act", pre-judgment and post-judgment interest awarded by a court and punitive or exemplary damages to the extent such damages are insurable under applicable law.

For the purpose of determining the insurability of punitive damages and exemplary damages, the laws of the jurisdiction most favorable to the insurability of the damages will control, provided that the jurisdiction has a substantial relationship to the relevant insured or to the "claim" giving rise to the damages.

"Loss" does not include fines, penalties, taxes, the multiplied portion of any multiple damage award or damages owed based on an express obligation by written or oral agreement or amounts owed under any contract or agreement. In addition, "loss" does not include the cost to modify or provide any accommodation to any disabled person or the cost to conduct any program, procedure or training.

"Loss" also means, with respect to any "claim" arising out of a "wrongful employment act" or "third party wrongful act", front-pay and back-pay, and liquidated damages awarded pursuant to the Age Discrimination In Employment Act, the Equal Pay Act or the Family Medical Leave Act.

In addition, "loss" does not include:

a. Employment-related benefits, retirement benefits, improper payroll deductions, severance pay, unpaid wages and commissions, compensation for vacation and sick days, medical and insurance benefits, and overtime pay for hours actually worked or labor actually performed by any "employee" of the "organization";

b. Deferred cash incentive compensation or any other type of compensation other than salary, wages, bonuses, commissions, non-deferred cash incentive compensation; and

c. Liquidated damages, except to the extent specifically included above.

In addition, "loss" does not include the cost of any remedial, preventative or other non-monetary relief, including but not limited to any costs associated with compliance with any such relief of any kind or nature imposed by any judgment, settlement or governmental authority.

12. **"Organic pathogen"** means any organic irritant or contaminant, including but not limited to mold, fungus, bacteria or virus, or any of their by-products such as mycotoxin, mildew, or biogenic aerosol.

13. **"Organization"** means you and your "subsidiaries" and includes a debtor-in-possession or the bankruptcy estate of the "organization" under United States bankruptcy law or an equivalent status under the law of any other jurisdiction.

14. **"Personal injury offense"** means:

a. False arrest, detention or imprisonment;

b. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor; or

c. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services.

15. **"Retaliation"** means any actual or alleged retaliatory treatment against an "employee" because of:

a. The exercise of, or attempt to exercise, an "employee's" rights under law; or

b. An "employee's" disclosure of, or threat to disclose to a governmental agency or superior, acts of actual or alleged wrongdoing by an insured; or

c. The filing of a claim under federal, state or local whistle-blower laws including the federal False Claims Act.

16. **"Subsidiary"** means any entity, as of the effective date of the policy, in which you own or control, directly or indirectly, the right to elect or appoint more than fifty percent of the entity's directors, trustees, or managers, and that entity is named in the "application".

17. "Third party wrongful act" means "discrimination", including "harassment", by any insured against any natural person who is not an "employee".

18. "Whistleblower conduct" means any of the activity set forth in 18 U.S.C. Sec. 1514A(a), engaged in by a whistleblower with a federal regulatory or law enforcement agency, Member of Congress or any committee of Congress, or person with supervisory authority over the whistleblower, or an enforcement action by the whistleblower set forth in 18 U.S.C. Sec. 1514A(b).

19. "Wrongful act" means any actual or alleged act, error, omission, misstatement, misleading statement, neglect, breach of duties, "personal injury offense" or violations of the Sherman Antitrust Act or similar federal, state or local statutes or rules.

   a. By the "organization"; or

   b. By an "individual insured", arising solely from duties conducted on behalf of the "organization"; or

   c. Asserted against an "individual insured" because of an actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duties by the "organization".

A "wrongful act" does not include any "wrongful employment act" or "third party wrongful act".

20. "Wrongful employment act" means any actual or alleged act of the following:

   a. "Discrimination"; or

   b. "Harassment"; or

   c. "Retaliation"; or

   d. "Wrongful termination"; or

   e. Violation of the Uniformed Services Employment & Reemployment Rights Act; or

   f. Violation of the Family and Medical Leave Act of 1993; or

   g. Violation of state law having the same or substantially similar purpose as the Acts in e. and f. above; or

   h. Acts described in clauses a. through g. above, arising from the use of the "organization's" Internet, e-mail, telecommunication or similar systems,; including the failure to provide and enforce adequate policies and procedures relating to use of the "organization's" Internet, e-mail, telecommunication or similar systems.

21. "Wrongful termination" means termination of an employment relationship in a manner which is illegal and wrongful or in breach of an implied agreement to continue employment. However, "wrongful termination" does not include any breach of a written employment contract.

## SECTION III - EXCLUSIONS

This insurance does not apply to any "loss" or "defense costs" in connection with any "claim" made against an insured, arising out of, directly or indirectly resulting from, or in consequence of, or in any way involving:

1. **Bodily Injury or Property Damage**

   Any actual or alleged bodily injury, sickness, humiliation, mental anguish, emotional distress, assault, battery, disease or death of a person, or theft, conversion, misappropriation, damage to or destruction of any tangible property including any loss of use or slander of title. This exclusion does not apply to "claims" for mental anguish, emotional distress, invasion of privacy, or humiliation, that result from a "wrongful employment act" or "third party wrongful act".

2. **Professional Liability**

   Medical malpractice or counseling or any error or omission by a professional while rendering services, including the failure to render services.

3. **Contractual Liability**

   Liability under any contract or agreement except liability that would exist even in the absence of the contract or agreement.

4. **Pending and Prior Litigation**

   Any litigation pending as of or prior to the effective date of this policy; provided that, if this policy is a renewal of a policy or policies previously issued by us and if the coverage provided by us was continuous from the effective date of the first policy to the effective date of this policy, the reference in this exclusion to effective date will mean the effective date of the first policy under which we first provided continuous coverage to you.

5. **Prior Knowledge**

   Any actual or alleged act, error or omission, breach of duty or circumstance that an insured:

   a. Had knowledge of prior to the effective date of the policy; and

   b. Had a reasonable belief the actual or alleged act, error or omission, breach of duty or circumstance could result in a "claim".

6. **Pollution**

   The actual, alleged or threatened discharge, dispersal, release or escape of pollutants, or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants.

DEL 01 (02/12)

WW 000023

RENTKO DEC - EXHIBIT B
Page 000026

Pollutants include, but are not limited to, any solid, liquid, gaseous or thermal irritant or contaminant, including "organic pathogens", smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.

7. **Nuclear, Biological and Chemical Materials**

   a. The use, release or escape of nuclear materials, or any resulting nuclear reaction or radiation or radioactive contamination; or

   b. The dispersal or application of pathogenic or poisonous biological or chemical materials.

8. **Construction Defect**

   Any "construction defect".

9. **Fraud**

   Any fraudulent, dishonest, or criminal act. However, this exclusion does not apply to "defense costs" incurred until such conduct is established to be fraudulent, dishonest or criminal.

   The "wrongful act" of any "individual insured" will not be imputed to any other "individual insured".

10. **Illegal Profits**

    The gain of any profits, remuneration or advantage to which an insured was not legally entitled. However, this exclusion does not apply to "defense costs" incurred until a final and non-appealable judgment or adjudication is rendered against the insured as to this conduct.

    The "wrongful act" of any "individual insured" will not be imputed to any other "individual insured".

11. **Builders and Developers**

    Operations performed, completed, or being conducted, by or on behalf of the builder, developer or sponsor, including damages arising out of designs, surveys or engineering services performed by or on behalf of the builder, developer or sponsor.

12. **Labor Disputes and Negotiations**

    Any lockout, strike, picket line, replacement of worker(s) or other similar actions resulting from labor disputes or labor negotiations. However, this exclusion does not apply to a "claim" for actual or alleged "retaliation" from the foregoing.

13. **Labor Relations Acts**

    a. The Fair Labor Standards Act (except the Equal Pay Act);

    b. The National Labor Relations Act;

    c. The Worker Adjustment and Retraining Notification Act;

    d. The Consolidated Omnibus Budget Reconciliation Act of 1985;

    e. The Occupational Safety and Health Act;

    f. Any workers' compensation, unemployment insurance, social security, or disability benefits law;

    g. The Racketeering Influence and Corrupt Organizations Act;

    h. The Federal False Claims Act; or

    i. Other similar provisions of any federal, state or local or common law or any rules or regulations promulgated under any of the foregoing.

    However, this exclusion does not apply to a "claim" for actual or alleged "retaliation" arising from your violation of such law.

14. **ERISA**

    Any pension, profit sharing, welfare benefit or other employee benefit program established in whole or part for the benefit of any "individual insured", or based upon, arising out of or. in any way involving the Employee Retirement Income Security Act of 1974 (except Section 510 thereof) or any amendments to the Act or regulations promulgated thereunder or similar provisions of any federal, state or local law or common law. However, this exclusion does not apply to any "claim" for actual or alleged "retaliation" with regards to benefits paid or payable.

15. **Copyright, Patent or Trademark Infringement**

    Infringement of a copyright, patent or trademark.

16. **Accommodations for Disabled Persons**

    Any alleged or actual failure of any building or property to, comply with any federal, state or other statute or code which requires any building or property to be more accessible or accommodating to any disabled person.

17. **Insured vs. Insured**

    Any "claim" by, at the behest of, or on behalf of the "organization" or any "individual insured". However, this exclusion does not apply to:

    a. A "claim" brought by an "individual insured" for a "wrongful employment act";

    b. Any derivative "claim" made on behalf of the "organization" by a member, an attorney general or any other such representative party if such action is brought and maintained totally independently of and totally without the solicitation, assistance, active participation or intervention of any "individual insured" or the "organization". However, that "whistleblower conduct" by an "individual insured", other than a director or equivalent position, will not be considered solicitation, assistance, active participation, or intervention of an "individual insured";

DEL 01 (02/12)

WW 000024

RENTKO DEC - EXHIBIT B
Page 000027

c.  Any "claim" that is brought or maintained by any bankruptcy or insolvency trustee or bankruptcy appointed representative of the "organization", or receiver, examiner, liquidator or similar official for the "organization";

d.  Any "claim" that is brought or maintained by any insured in the form of a cross claim, third party claim  or other proceeding for contribution or indemnity which is part of, and directly results from a "claim" that is covered by this coverage form; or

e.  Any "claim" that is brought or maintained by any former director or officer of the "organization" and where the "claim" is solely based upon and arising out of "wrongful acts" committed subsequent to the date such director or officer ceased to be a director or officer of the "organization" and where the "claim" is first made 4 years subsequent to the date such director or officer ceased to be a director or officer of the "organization".

**18. Written Employment Contracts**

Any actual or alleged breach of an express obligation set forth in a written employment contract.

**19. Other Capacity**

Any act or omission by an insured in his or her capacity with an entity other than the "organization".

**20. Lobbying Activities**

Any attempts to influence legislators or officials, or decisions made by a governmental entity including payments, political contributions, commissions, gratuities, benefits or any other favors to or for the benefit of any officials, agents, representatives or employees, including family members, of any governmental entity or any entity with which they are affiliated.

**21. Securities Liability Exclusion**

A violation or alleged violation of (1) the Federal Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Company Act of 1940, or any other federal law with respect to the regulation of securities; (2) any state securities or blue sky law; or (3) any provision of the common law imposing liability in connection with the offer, sale, or purchase of securities.

**22. Unpaid Compensation**

Improper payroll deductions, unpaid wages, misclassification of exempt or non-exempt employee status, compensation earned by or due to the claimant but not paid by the insured (including, but not limited to, commission, vacation and sick days, retirement benefits, and severance pay), overtime pay for hours actually worked or labor actually performed by any "employee" of the "organization". However, this exclusion does not apply to any back pay or front pay allegedly due as the result of "discrimination", or that part of any "claim" alleging "retaliation".

**SECTION IV - LIMITS OF INSURANCE**

1.  The Limits of Insurance shown in the Declarations and the rules below determine the most we will pay regardless of the number of:

    a.  Insureds;

    b.  "Claims" made; or

    c.  Persons or organizations making "claims".

2.  The Directors and Officers Aggregate Limit is the most we will pay under Coverage A for all "loss", due to "wrongful act" "claims".

3.  The Employment Practices Aggregate Limit is the most we will pay under Coverage B for all "loss", due to "wrongful employment act" or "third party wrongful act" "claims".

4.  If both Coverage A and Coverage B apply to the same "claim" or "interrelated claim", the largest aggregate limit from one of the Coverages will be the maximum Limit of Insurance available for the "claim" or "interrelated claim".

The Limits of Insurance for this Coverage Part apply separately to each consecutive annual period starting with the beginning of the policy period shown in the Common Policy Declarations. However, if:

a.  This Coverage Part is issued for a period of more than twelve months but less than twenty-four months; or

b.  The policy period is extended after issuance for an additional period of less than twelve months,

then the time periods exceeding the standard twelve-month policy period described in a. and b. will be deemed part of the last preceding period for the purpose of determining the Limits of Insurance.

Any Extended Reporting Period, if applicable, will be deemed part of the last policy period for the purpose of determining the Limits of Insurance.

**SECTION V - RETENTION**

1.  For each "claim":

    a.  The insured is responsible for the total of "loss" and "defense costs" up to the applicable Retention shown in the Coverage Part Declarations;

    b.  We will only pay for "loss" and/or "defense costs" if the total of "loss" and "defense costs" that is otherwise payable under this insurance exceeds the applicable Retention shown in the Coverage Part Declarations.

2.  If we, at our sole discretion, elect to pay any part or all of the Retention, the insured must repay this amount to us upon demand.

WW 000025

RENTKO DEC - EXHIBIT B
Page 000028

3. Any Retention shown in the Coverage Part Declarations is not applicable to a "claim" for which an "individual insured" is not indemnified by you.

4. Solely with respect to the above, we agree that we will not seek to rescind the policy with respect to any "individual insured" who did not know the facts misrepresented or omitted.

5. You must indemnify an "individual insured" to the fullest extent permitted by law and must take all necessary steps to do so. Paragraph 3. does apply if you cannot legally indemnify an "individual insured" because of the appointment by a state or federal official, agency or court of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to take control of, supervise, manage or liquidate you, or because you become a debtor-in-possession.

## SECTION VI – CONDITIONS

### A. CLAIMS CONDITIONS

1. Insured's Duties When There is a "Claim"

   As a condition precedent to the right of coverage provided by this Coverage Part, the insured must do the following:

   a. If a "claim" to which this Coverage Part applies is made against an insured, the insured must give written notice, as soon as practicable, but in no event later than 60 days after the expiration of the Coverage Part to:

      Western World Insurance Group
      400 Parson's Pond Drive
      Franklin Lakes, NJ 07417
      Attn: Claims Department

      Written notice must include every demand, notice, summons or other process received directly by the insured or the insured's representatives.

   b. Cooperate with us. We may require that the insured submit to examination under oath, produce and make available all records, documents and other materials, and attend hearings, depositions and trials. The insured must assist us in effecting settlement, securing and providing evidence and obtaining the attendance of witnesses.

   c. Not admit liability, settle any claims, or assume any obligations without our prior written consent.

2. Reporting of a Possible "Claim"

   If during the policy period, any insured first becomes aware of a specific "wrongful act", "wrongful employment act" or "third party wrongful

act" that could result in a "claim" and gives written notice to us during the policy period of:

   a. The potential claimant's name and address; and

   b. A chronological description of the events that are involved; and

   c. An explanation of the type of "claim" that is anticipated,

   then any "claim" arising out of the "wrongful act" or "wrongful employment act" or "third party wrongful act" which is subsequently made against the insured will be deemed to have been made at the time we received the written notice from the insured.

### B. GENERAL CONDITIONS

1. When We Do Not Renew

   If we decide not to renew this Coverage Part, we will mail or deliver to you written notice of the nonrenewal not less than 30 days before the expiration date.

   If notice is mailed, proof of mailing will be sufficient proof of notice.

2. Extended Reporting Period

   a. If this Coverage Part is cancelled or not renewed, you have the right to purchase an Extended Reporting Period. The Extended Reporting Period applies only to "claims" for a "wrongful act", "wrongful employment act" or "third party wrongful act" committed prior to the termination of this coverage and otherwise insured by this Coverage Part. However, you must notify us in writing of your decision to purchase the Extended Reporting Period and the premium must be paid within 30 days of the termination date of this coverage. The right to purchase an Extended Reporting Period does not apply if the cancellation was for non-payment of premium or non-compliance with the terms of this Coverage Part.

   b. The premium for the Extended Reporting Period endorsement will be computed according to the following percentages based on the annual premium amount of this Coverage Part:

      A one-year Extended Reporting Period for 30% of the expiring premium;

      A two-year Extended Reporting Period for 75% of the expiring premium;

      A three-year Extended Reporting Period for 120% of the expiring premium.

   c. The Extended Reporting Period cannot be cancelled or renewed.

DEL 01 (02/12)

WW 000026

RENTKO DEC - EXHIBIT B
Page 000029

d. The additional premium for the Extended Reporting Period is fully earned at the inception of the Extended Reporting Period.

e. Coverage for a "claim" or circumstances which ultimately lead to a "claim" first received and reported during the Extended Reporting Period will be in excess over any other valid and collectible insurance providing coverage for that "claim".

f. The Extended Reporting Period does not reinstate or increase the Limits of Insurance available under this Coverage Part.

g. The Extended Reporting Period begins on the effective date of cancellation or non-renewal of the policy.

3. Order of Payments

In the event payment of "loss" is due under this Coverage Part but the amount of the "loss" exceeds the remaining available Limit of Insurance specified in the Declarations, we will, to the extent of any remaining amount of the Limit of Insurance available:

a. First pay for "loss" on behalf of the "individual insured" for which coverage is provided, then

b. Pay for "loss" on behalf of the "organization" for which coverage is provided.

4. Transfer of Rights of Recovery Against Others to Us

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do everything necessary to secure our rights and must do nothing to impair them.

5. Other Insurance

This insurance will be excess over any other valid and collectible insurance, unless the other insurance is specifically written to be in excess of this Coverage Part.

6. Terms of Coverage Part Conformed to Statute

Terms of this Coverage Part which are in conflict with the statutes of the state in which this policy is issued, are hereby amended to conform to those statutes.

7. Transactions

a. If after the effective date of this Coverage Part:

(1) You merge into, or consolidate with, another entity and you are not the surviving entity; or

(2) Another entity, person or group of entities and/or persons acting in concert acquires more than fifty percent of your assets; or

(3) Another entity, person or group of entities and/or persons acting in concert acquires the right to elect or select a majority of your directors, trustees, or managers; or

(4) You sell all or substantially all of your assets,

this Coverage Part will continue in effect until the expiration date of the policy, or the effective date of non-renewal, if applicable, with respect to "wrongful acts", "wrongful employment acts" or "third party wrongful acts" occurring before the transaction, but there is no coverage under this policy for actual or alleged "wrongful acts", "wrongful employment acts" or "third party wrongful acts" occurring on or after the transaction.

b. You must give us written notice of the transaction as soon as practicable, but not later than 30 days after the effective date of the transaction.

The entire premium for this coverage is fully earned on the transaction date. In the event of a transaction, you will have the right to an offer of coverage from us for an Extended Reporting Period to report "wrongful acts", "wrongful employment acts" or "third party wrongful acts" occurring prior to the effective date of the transaction.

DEL 01 (02/12)

WW 000027

RENTKO DEC - EXHIBIT B
Page 000030

This Endorsement Modifies Your Policy.
Please Read It Carefully.

**BACKDATED PENDING AND PRIOR LITIGATION EXCLUSION**

This endorsement modifies insurance provided under the following:

DIRECTORS, OFFICERS, INSURED ENTITY AND EMPLOYMENT PRACTICES
INSURANCE COVERAGE PART

Section III, EXCLUSIONS, subsection 4., Pending and Prior Litigation, is deleted in its
entirety and replaced with the following:

4.  Pending and Prior Litigation

Any litigation pending as of or prior to <u>2/17/2010</u>, or alleging or derived from the
same or essentially the same facts as alleged in such pending or prior litigation.

DEL56 (07/12)

WW 000028

RENTKO DEC - EXHIBIT B
Page 000031

This Endorsement Modifies Your Policy.
Please Read It Carefully.

### SHARED LIMITS ENDORSEMENT

This endorsement modifies insurance provided under the following:

DIRECTORS, OFFICERS, INSURED ENTITY AND EMPLOYMENT PRACTICES
INSURANCE COVERAGE PART

Section IV – LIMITS OF INSURANCE is amended by adding the following:

5. Notwithstanding Subsections 2. and 3. to the contrary, our maximum Aggregate Limit of Insurance, as stated on the Coverage Part Declarations, for the sum of all "loss" and "defense costs" for all "claims" or "interrelated claims" made under Coverages A. and B. will be $ 1,000,000.

DEL74 (10/11)

WW 000029

RENTKO DEC - EXHIBIT B
Page 000032

This Endorsement Modifies Your Policy.
Please Read it Carefully.

**RELIANCE UPON ANOTHER'S APPLICATION ENDORSEMENT**

This endorsement modifies insurance provided under the following:

DIRECTORS, OFFICERS, INSURED ENTITY AND EMPLOYMENT PRACTICES
INSURANCE COVERAGE PART

SECTION VI – CONDITIONS, Subsection B., is amended with the addition of the following:

B. Representations:

Any and all references to an "application" in this policy will include the application or proposal described below.  We have relied upon all statements, representations and other information and documents contained in or submitted with the other application or proposal as if they were submitted directly to us using our own "application" form.

Type of Application/Proposal: _Blank Extra_____

Carrier: ___CNA_____

Date Signed: __2/7/2014_____

DEL86 (10/11)

WW 000030

RENTKO DEC - EXHIBIT B
Page 000033

This Endorsement Modifies Your Policy.
Please Read It Carefully.

## SETTLEMENT AMENDATORY ENDORSEMENT

This endorsement modifies insurance provided under the following:

> DIRECTORS, OFFICERS, INSURED ENTITY AND EMPLOYMENT PRACTICES
> INSURANCE COVERAGE PART

SECTION I - INSURING AGREEMENTS is amended as follows:

Section 4. Defense. Subsection d. is deleted in its entirety and replaced with the following:

d.  We will not settle any "claim" without your written consent.  Such consent will not be unreasonably withheld.  If you refuse to consent to a settlement recommended by us and acceptable to the claimant, then our Limits of Insurance under this policy with respect to the "claim" will be reduced by:

  1.  The amount of "loss" for which the "claim" could have been settled plus all "defense costs" incurred prior to the date of the refusal; and

  2.  80% of all subsequent covered "defense costs" in excess of the amount incurred in (1.) above, which sum will not exceed the unexhausted Limits of Insurance specified in item 1. or item 4. of the Coverage Part Declarations.

  The remaining 20% of "defense costs" and all subsequent "loss" will be borne uninsured by you and at your own risk.

  In this event, we may, at our sole discretion, tender a check to you for the recommended settlement amount and will be relieved of any further duty or obligation, other than for covered "defense costs" referenced above.

The following is added to Section 4:

e.  If we recommend a settlement within the policy Limits of Insurance which is agreed to by the claimant (herein known as the "settlement opportunity"), and:

  1.  You consent to the settlement within 30 days of the date you are first made aware of the "settlement opportunity";

  2.  You consent within the first 90 days after the "claim" is first reported to us; and

  then, in the event the "claim" settles as a result of such "settlement opportunity", the retention applicable to the "claim" will be reduced by 25% for such "claim".  It will be a condition to such reduction that all of you must consent to the settlement.

DEL 98 (08/13)

WW 000031

RENTKO DEC - EXHIBIT B
Page 000034

This Endorsement Modifies Your Policy.
Please Read It Carefully.

## PENSION TRUST LIABILITY INSURANCE COVERAGE EXTENSION
## (SHARED AGGREGATE LIMIT)

This endorsement modifies insurance provided under the following:

DIRECTORS, OFFICERS, INSURED ENTITY AND EMPLOYMENT PRACTICES
INSURANCE COVERAGE PART

The Directors, Officers, Insured Entity and Employment Practices Insurance Coverage Part
Declarations are amended with the addition of the following:

PENSION TRUST LIABILITY INSURANCE COVERAGE

| | |
|---|---|
| PENSION TRUST LIABILITY AGGREGATE LIMIT: | $ 1,000,000 |
| "VOLUNTARY COMPLIANCE LOSS" SUB-LIMIT: | $ 25,000 |
| "HIPAA PENALTIES" SUB-LIMIT: | $ 25,000 |
| RETENTION (EACH CLAIM): | $ 0 |

SECTION I - INSURING AGREEMENTS is amended by adding the following:

**Coverage C. Pension Trust Liability**

We will pay on behalf of the "fiduciary insured" all "loss" that the "fiduciary insured" becomes
legally obligated to pay because of a "claim" first made against the "fiduciary insured" during the
policy period for "fiduciary wrongful acts":

a. Arising solely out of the "individual insured's" performance of his or her duties on behalf of
the "plan"; or

b. Attributed to the "organization".

Further, we will:

a. Pay the "voluntary compliance loss" and "delinquent filer penalties";

b. Reimburse the "voluntary fiduciary correction expense"; and

c. Pay the "HIPAA penalties"

of the "fiduciary insureds" which the "fiduciary insureds" have become legally obligated to pay by
reason of a "claim" first made against the "fiduciary insureds" during the policy period or, if
elected, the Extended Reporting Period, and reported to us, for any "fiduciary wrongful act"
taking place prior to the end of the policy period, but only up to the Sub-Limit for "voluntary
compliance loss" and "HIPAA penalties" as set forth above.

SECTION II - DEFINITIONS is amended as follows:

Definition 2, "Claim", is amended by adding the following:

"Claim" also means a civil proceeding or formal investigation brought by the U.S. Department of
Labor, the U.S. Pension Benefit Guaranty Corporation, or any similar federal, state or local
governmental body, including any appeal therefrom.

"Claim" also includes a written request to toll or waive any statute of limitations.

DEL 100 (08/13)

WW 000032

RENTKO DEC - EXHIBIT B
Page 000035

Definition 9, "Individual Insureds", is amended by adding the following:

"Individual Insureds" also means:

a. Any person(s) who was, now is, or will become a trustee, director, officer, fiduciary or "employee" of any "plan" except one who is a lawyer, accountant, actuary, or investment advisor not employed as such on a full time basis by the "organization"; or

b. Any person(s) for whose "fiduciary wrongful acts" any of the "fiduciary insureds" are legally responsible for and included by specific written endorsement to this policy, provided further that such "fiduciary insured" is sued solely in his or her capacity as a fiduciary of the "plan".

Definition 11, "Loss", is deleted and replaced with the following:

"Loss" means damages and settlements which an insured is legally obligated to pay as a result of a "claim" for a "fiduciary wrongful act", pre-judgment and post-judgment interest awarded by a court and punitive or exemplary damages to the extent such damages are insurable under applicable law.

For the purposes of determining the insurability of punitive damages and exemplary damages, the laws of the jurisdiction most favorable to the insurability of the damages will control, provided that the jurisdiction has a substantial relationship to the relevant insured or to the "claim" giving rise to the damages.

"Loss" also includes:

a. The 5% or less, or the 20% or less, civil penalties imposed upon a "fiduciary insured" as a fiduciary under sections 502(i) or (l) of the Employee Retirement Income Security Act of 1974, as amended, or any similar state or local common or statutory law, and any rules and regulations promulgated thereunder;

b. "Voluntary compliance loss";

c. "Delinquent filer penalties";

d. "Voluntary fiduciary correction expenses"; and

e. "HIPAA penalties".

"Loss" does not include any other fines, penalties or taxes or costs associated with any compliance imposed by any judgment, settlement or government authority other than those expressly listed above.

"Loss" does not include the multiplied portion of any multiple damage award or damages owed based on an express obligation by written or oral agreement or amounts owed under any contract or agreement. "Loss" does not include any sum, amount or payment which constitutes restitution or disgorgement including the return of any fees or expenses in the "administration" of any "plan".

In addition, "loss" does not include:

a. Benefits due or to become due under a "plan"; or

b. Benefits which would be due if such "plan" complied with all applicable law, including "loss" resulting from the payment of plaintiff attorneys' fees based upon a percentage of such benefits or payable from a common fund established to pay such benefits, except:

(1) To the extent that benefits are payable by an "individual insured" as a personal obligation, and recovery for the benefits is based upon a covered "fiduciary wrongful act"; or

(2) By reason of a change in value of the investments held by a "plan" when a "claim" is made against an insured that alleges a "loss" to such "plan", even if the amounts sought or recovered by the plaintiffs in such "claim" are described by plaintiffs as benefits or held by a court as benefits.

WW 000033

RENTKO DEC - EXHIBIT B
Page 000036

**SECTION II - DEFINITIONS** is amended by adding the following:

1. **"Administration"** means:

   a. Counseling "employees", beneficiaries or "plan" participants with respect to any "plan";

   b. Providing interpretations with respect to any "plan";

   c. Handling records in connection with any "plan"; or

   d. Enrolling, terminating, or canceling "employees" or beneficiaries under any "plan".

2. **"Consulting fees"** means fees charged by a third-party actuary, benefits consultant or accountant resulting solely from the correction of non-compliance set forth in a "voluntary compliance program". "Consulting fees" do not include any fees, costs and expenses associated with:

   a. A "plan" audit; or

   b. Identifying, finding or assessing such non-compliance.

3. **"Delinquent filer penalties"** means penalties assessed by the U.S. Department of Labor or the Internal Revenue Service ("IRS") under a Delinquent Filer Voluntary Compliance Program for inadvertent failure to file Form 5500, provided that the failure to file such Form 5500 occurred during the policy period or during the policy period of a policy issued by us of which this policy is a continuous renewal.

4. **"Employee benefit plan"** means any "plan" so defined by "ERISA".

5. **"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended (including, but not limited to, amendments relating to the Consolidated Omnibus Budget Reconciliation Act of 1985, the Health Insurance Portability and Accountability Act of 1996 as it relates to sections 102(b) and 104(b)(1) of "ERISA", the Newborns' and Mothers' Health Protection Act of 1996, the Mental Health Parity Act of 1996, the Women's Health and Cancer Rights Act of 1998, and the Pension Protection Act of 2006, as amended), or any similar foreign, state or local common or statutory law, or any rules and regulations promulgated thereunder.

6. **"Fiduciary insured"** means:

   a. The "organization";

   b. Any "plan";

   c. Any "individual insureds"; and

   d. Any other natural person or entity who was, now is, or will be acting as a "plan" administrator of any of the "plans" at your written request and consent and included by specific written endorsement to this policy.

   Outside fiduciaries and third-party administrators are not "fiduciary insureds" unless added as an additional "fiduciary insured" to this policy by specific, written endorsement.

7. **"Fiduciary wrongful act"** means:

   a. With respect to a "sponsored plan":

      (1) Any actual or alleged breach of the responsibilities, obligations or duties imposed upon fiduciaries of the "sponsored plan" by "ERISA", or by "HIPAA";

      (2) Any other matter claimed against you or any of the "individual insureds" solely because of your service or the service of any of the "individual insureds" as a fiduciary of any "sponsored plan", including any actual or alleged violation of "HIPAA"; or

      (3) Any actual or alleged act, error or omission in the "administration" of any "sponsored plan", including any actual or alleged violation of "HIPAA".

DEL 100 (08/13)

WW 000034

RENTKO DEC - EXHIBIT B
Page 000037

    b. With respect to an "insured plan", any actual or alleged act, error or omission in the "administration" of such "insured plan".

8. "HIPAA" means the Health Insurance Portability and Accountability Act of 1996 and the Health Information Technology for Economic and Clinical Health Act, or any similar state or local common or statutory law, and any rules and regulations promulgated under either of these Acts.

9. "HIPAA penalties" means civil money penalties imposed upon a "fiduciary insured" for violation of Part 164 of the regulations under the Health Insurance Portability and Accountability Act of 1996, popularly known as HIPAA Privacy Regulations, and any rules or regulations promulgated thereunder.

10. "Insured plan" means any government-mandated insurance for workers' compensation, unemployment, social security or disability benefits for your "employees"

11. "Pension benefit plan" means any "plan" so defined in "ERISA".

12. "Plan" means:

    a. Any "sponsored plan"; and

    b. Any "insured plan",

established before or after the inception of this policy.

13. "Plan termination" means the termination, suspension, merger or dissolution of any "plan".

14. "Sponsored plan" means:

    a. Any "employee benefit plan", "pension benefit plan", or "welfare benefit plan" which is operated by you for the benefit of your "employees";

    b. Any other "plan", fund or program specifically included as a "sponsored plan" by endorsement to this policy; and

    c. Any other "employee benefit plan" or program not subject to Title 1 of "ERISA", sponsored by you for the benefit of your "employees";

provided, however, that the "sponsored plan" does not include any:

    a. "Employee" stock ownership "plan"; or

    b. Multi-employer "plan", as defined in "ERISA".

15. "Voluntary compliance loss" means fines, penalties, sanctions, voluntary correction fees, compliance fees or user fees assessed against or collected from a "fiduciary insured" by the U.S. Internal Revenue Service pursuant to a "voluntary compliance program" for the actual or alleged inadvertent non-compliance by a "plan" with any statute, rule or regulation if participation by the insured in such "voluntary compliance program" results in your obtaining a "No Action" letter from the governmental authority; provided "voluntary compliance loss" will not include: (a) Any costs to correct the non-compliance, or any other charges, expenses, taxes or damages; or (b) Any fees, fines, penalties, sanctions or "defense costs" relating to a "plan" which, as of the earlier of inception of this policy or inception of the first policy in an uninterrupted series of policies issued by us of which this policy is a direct or indirect renewal or replacement, any "individual insured" knew to be actually or allegedly non-compliant.

16. "Voluntary compliance program" means a written agreement to correct an inadvertent "plan" defect under a voluntary compliance resolution program or similar voluntary settlement program administered by the U.S. Internal Revenue Service, the U.S. Department of Labor or other similar governmental authority, including without limitation the Employee Plans Compliance Resolution System, the Audit Closing Agreement Program, the Voluntary Compliance Resolution Program, the Walk-In Closing Agreement Program, the Administrative Policy Regarding Self-Correction, the Tax Sheltered Annuity Voluntary

DEL 100 (08/13)

WW 000035

RENTKO DEC - EXHIBIT B
Page 000038

Correction Program, the Delinquent Filer Voluntary Compliance Program, and the Voluntary Fiduciary Correction Program, provided that such agreement to correct such "plan" defect was entered into in writing by you with the U.S. Internal Revenue Service during the policy period, or during the policy period of a policy issued by us of which this policy is a continuous renewal.

17. "Voluntary fiduciary correction expense" means "defense costs", and "consulting fees" incurred in connection with correction of non-compliance set forth in a "voluntary compliance program".

"Voluntary fiduciary correction expense" does not include (a) Any other charges, expenses, taxes or damages, other than "defense costs" and "consulting fees"; or (b) Any fees, fines, penalties, sanctions or "defense costs", and "consulting fees", relating to a "plan" which, as of the earlier of inception of this policy or inception of the first policy in an uninterrupted series of policies issued by us of which this policy is a direct or indirect renewal or replacement, any "individual insured" knew to be actually or allegedly non-compliant.

18. "Welfare benefit plan" means any "employee" "welfare benefit plan" so defined in "ERISA"

SECTION III - EXCLUSIONS is amended as follows:

Exclusion 14. ERISA, is deleted in its entirety.

Exclusion 4. Pending and Prior Litigation and Exclusion 13. Labor Relations Act, are deleted in their entirety and replaced with the following:

This insurance does not apply to any "loss" or "defense costs" in connection with any "claim" made against an insured, arising out of, directly or indirectly resulting from, or in consequence of, or in any way involving:

4.  Pending and Prior Litigations and Investigations

Any pending or prior civil, criminal, administrative, or investigative proceeding involving the "plan" and/or any "fiduciary insured" as of the effective date of this policy or any "fiduciary wrongful act" or any fact, circumstance or situation underlying or alleged in such proceeding; provided, that, if this policy is a renewal of a policy or policies previously issued by us and if the coverage provided by us was continuous from the effective date of the first policy to the effective date of this policy, the reference in this exclusion to effective date will mean the effective date of the first policy under which we first provided continuous coverage to you.

13. Labor Relations Act

a.  The Fair Labor Standards Act;

b.  The National Labor Relations Act;

c.  The Worker Adjustment and Retraining Act;

d.  The Occupational Safety and Health Act;

e.  The Racketeering Influence and Corrupt Organizations Act;

f.  The Federal False Claims Act;

g.  Other similar provisions of any federal, state or local or common law of any rules or regulations promulgated under any of the foregoing.

This exclusion does not apply to any actual or alleged obligation of any "fiduciary insured" pursuant to the:

(1)  Consolidated Omnibus Budget Reconciliation Act of 1985, as amended; or

(2)  Health Insurance Portability and Accountability Act of 1996, as amended.

DEL 100 (08/13)

WW 000036

RENTKO DEC - EXHIBIT B
Page 000039

SECTION III - EXCLUSIONS is amended by adding the following:

This insurance does not apply to any "loss" or "defense costs" in connection with any "claim" made against an insured, arising out of, directly or indirectly resulting from, or in consequence of, or in any way involving:

**1. Employment Law Compliance**

The failure to comply with any statutory or common law governing workers' compensation, unemployment, social security or disability benefits or any similar law; provided, however, this exclusion does not apply to any actual or alleged obligation of any "fiduciary insured" pursuant to the:

a. Consolidated Omnibus Budget Reconciliation Act of 1985, as amended; or

b. Health Insurance Portability and Accountability Act of 1996, as amended.

**2. Plan Termination**

Any "fiduciary wrongful act" committed subsequent to a "plan termination"; provided, however, that this exclusion will only apply to those "plans" which were the subjects of the "plan termination".

**3. Employment-Related Matters**

Any employment or employment-related matters; provided, however, this exclusion does not apply to any "claim" where such employment or employment-related matters involve actual or alleged violations of "ERISA".

**4. Breach of Contract**

Breach of any contract or agreement; except to the extent that liability would have attached to you in the absence of such contract or agreement, or where the liability was assumed in accordance with or under the trust agreement or equivalent document pursuant to which any of the "plans" were established. However, this exclusion does not apply to "defense costs" incurred.

**5. Contributions Owed**

a. The failure to collect from you contributions owed to any of the "plans", or the failure to fund a "plan" in accordance with "ERISA", unless the failure is solely due to the negligence of any of the "fiduciary insureds"; or

b. Any "claim" which constitutes benefits due to or to become due under the terms of any "plan" if such "plan" complied with all applicable law, unless and to the extent that:

(1) The "fiduciary insured" is a natural person and the benefits are payable by such "fiduciary insured" as a personal obligation; and

(2) Recovery for the benefits is based upon a covered "fiduciary wrongful act".

However, this exclusion does not apply to "defense costs" incurred.

**6. Successor Liability**

Any act, error or omission as respects a "plan" taking place at the time when the "organization" did not sponsor the "plan" or the "fiduciary insured" was not a fiduciary of the "plan".

SECTION IV - LIMITS OF INSURANCE is amended by adding the following:

**1.** The "Voluntary Compliance Loss" Sub-Limit is the most we will pay under the Pension Trust Liability Coverage for the payment of "voluntary compliance loss", "delinquent filer penalties", and "voluntary fiduciary correction expenses" combined resulting from all "claims" due to a "fiduciary wrongful act". Such amount will be part of, and not in addition to, the Pension Trust Liability Aggregate Limit.

DEL 100 (08/13)

WW 000037

RENTKO DEC - EXHIBIT B
Page 000040

2. The "HIPAA Penalties" Sub-Limit is the most we will pay under the Pension Trust Liability Coverage for the payment of "HIPAA penalties" resulting from all "claims" due to a "fiduciary wrongful act". Such amount will be part of, and not in addition to, the Pension Trust Liability Aggregate Limit.

3. The Pension Trust Liability Aggregate Limit is the most we will pay under the Pension Trust Liability Coverage for all "loss", due to "fiduciary wrongful act" "claims".

**SECTION IV - LIMITS OF INSURANCE is amended by adding the following:**

Our maximum Aggregate Limit, on the Declarations as Item 1. and/or 4., and the Pension Trust Liability Aggregate Limit in this endorsement for the sum of all "loss" and "defense costs" for all "claims" or "interrelated claims" made under Coverage A. and B. of the Coverage Parts and this endorsement will be $1,000,000.

DEL 100 (08/13)

WW 000038

RENTKO DEC - EXHIBIT B
Page 000041

This Endorsement Modifies Your Policy.
Please Read It Carefully.

## CRISIS MANAGEMENT ENDORSEMENT

This endorsement modifies insurance provided under the following:

DIRECTORS, OFFICERS, INSURED ENTITY AND EMPLOYMENT PRACTICES INSURANCE COVERAGE PART

The Directors and Officers Insurance Coverage Part Declarations is amended with the addition of the following:

**CRISIS MANAGEMENT FUND LIMIT**

Crisis Management Fund Limit $ 25,000.

**SECTION I - INSURING AGREEMENTS** is amended as follows:

Section 5, Coverage Extensions, is amended by adding the following:

d.  Crisis Management Coverage

(1) We will pay on your behalf "crisis management expenses" which you become legally obligated to pay by reason of a "crisis event" first occurring during the policy period.

(2) There will be no Retention applicable to "crisis management expenses", and we will pay such "crisis management expenses" from the first dollar subject to all other terms and conditions of this policy.

(3) An actual or anticipated "crisis event" must be reported to us as soon as practicable, but in no event later than thirty (30) days after you first incur "crisis management expenses" for which coverage will be requested under this policy.

(4) The Crisis Management Fund Limit is our maximum liability for all "crisis management expenses" arising from any and all "crisis events" occurring during the policy period. This limit will be our maximum liability under this policy regardless of the number of "crisis events" reported during the policy period. Our obligation to pay "crisis management expenses" terminates upon the exhaustion of the Crisis Management Fund Limit.

(5) If the policy's aggregate limits are exhausted then crisis management coverage ends.

(6) The Crisis Management Fund Limit will be in addition to the Aggregate Limit of Insurance stated in Item 1. of the Coverage Part Declarations.

**SECTION II - DEFINITIONS** is amended as follows:

Definition 11: "Loss", is amended by adding the following:

In addition, "loss" does not include "crisis management expenses".

The following definitions are added:

"Crisis event" means one of the following, except where coverage is otherwise excluded under SECTION III - EXCLUSIONS, Subsection 5. Prior Knowledge and Subsection 6. Pollution of the policy:

a. The incapacity; death; or state or federal criminal indictment of an "individual insured";

DEL102 (08/13)

WW 000039

RENTKO DEC - EXHIBIT B
Page 000042

b. The cancellation, withdrawal or revocation of $500,000 or more in funding, donation(s), grant(s) or bequest(s) by a non-government entity or person to you;

c. The disclosure by you of (1) your intention to file or your actual filing for protection under federal bankruptcy laws, or (2) a third party's intention to file or its actual filing of an involuntary bankruptcy petition under federal bankruptcy laws;

d. The disclosure by you of the threatened or actual commencement by a third party of an action, audit or investigation alleging a "wrongful employment act" by you which has caused or is reasonably likely to cause a "material effect"; or

e. Any other material event which, in your good faith opinion, has caused or is reasonably likely to result in a "material effect", but only if such material event is scheduled for coverage by written endorsement to this policy.

"Crisis management expenses" means the following expenses incurred by you during a period beginning ninety (90) days prior to, and in reasonable anticipation of a "crisis event" and ending ninety (90) days after an actual or reasonably anticipated "crisis event", irrespective of whether a "claim" is actually made with respect to the subject "crisis event"; provided, however, that we must have been notified of the "crisis management expenses" within thirty (30) days of the date you first incur the subject "crisis management expenses":

a. The reasonable and necessary expenses directly resulting from a "crisis event" which you incur for "crisis management services" provided to you by a "crisis management firm"; and

b. The reasonable and necessary expenses directly resulting from a "crisis event" which you incur for:

(1) Advertising, printing, or the mailing of matter relevant to the "crisis event"; and

(2) Out of pocket travel expenses incurred by or on behalf of you or the "crisis management firm";

provided, however, "crisis management expenses" does not include those amounts which otherwise would constitute compensation, benefits, fees, overhead, charges or expenses of an insured.

"Crisis management firm" means a marketing firm, public relations firm, law firm, or other professional services entity retained by us or by you with our prior written consent, to perform "crisis management services" arising from a "crisis event".

"Crisis management services" means the professional services provided by a "crisis management firm" in counseling or assisting you in reducing or minimizing the potential harm to you caused by the public disclosure of a "crisis event".

"Material effect" means the publication of unfavorable information regarding you which can reasonably be considered to materially reduce public confidence in your competence, integrity or viability to conduct business. Such publication must occur in a report about an insured appearing in a daily newspaper of general circulation; or a radio or television news program.

SECTION III - EXCLUSIONS is amended as follows:

SECTION III - EXCLUSIONS does not apply to "crisis management expenses".

DEL102 (08/13)

WW 000040

RENTKO DEC - EXHIBIT B
Page 000043

STOCK COMPANY

## COMMERCIAL LINES POLICY

**Western World**
I N S U R A N C E   G R O U P

POLICY NUMBER: BRL6000034

Prior Policy Number: NEW

☒ WESTERN WORLD INSURANCE COMPANY    ☐ TUDOR INSURANCE COMPANY    ☐ STRATFORD INSURANCE COMPANY

### COMMON POLICY DECLARATIONS                Agent/Broker #18464

Named Insured and Mailing Address:

Professional Collection Consultants

6700 S. Centinela Blvd. 3rd floor

Culver City, CA 90230

Producer:
U.S. Risk Pro
1551 N Tustin Ave

Santa Ana, CA 92705

Policy Period: (Mo./Day/Yr.)
From: 02/17/2014          To: 02/17/2015          12:01 AM, standard time at your mailing address shown above.

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

THIS POLICY CONSISTS OF THE FOLLOWING COVERAGES FOR WHICH A PREMIUM IS INDICATED. THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.

| | | |
|---|---|---|
| Commercial Property Coverage Part | | $ NOT COVERED |
| Commercial General Liability Coverage Part | | $ NOT COVERED |
| Commercial Auto Coverage Part | | $ NOT COVERED |
| Directors and Officers Coverage Part | | $ 13,799.00 |
| | | $ |
| | | $ |
| Other Coverages: | Terrorism Risk Insurance Act | $ INCLUDED |
| | | $ |
| | | $ |
| | | $ |
| | TOTAL ADVANCE PREMIUM | $ 13,799.00 |
| | SL Tax | $ 413.97 |
| | SL Stamping Fee | $ 27.60 |
| | | $ |
| Forms and endorsements applying to this policy and attached at time of issue: | | $ |
| | | $ |
| See Applicable Schedule Of Forms And Endorsements | | |
| | GRAND TOTAL | $ 14,240.57 |

Page 1 of 2                          WW230 (08/11)
COMPANY

WW 000041

RENTKO DEC - EXHIBIT B
Page 000044

COMMON POLICY DECLARATIONS (continued)

POLICY NUMBER: NPL8000034

The Named Insured is:

☐ Individual   ☐ Partnership   ☐ Limited Liability Company   ☒ Organization/Corporation   ☐ Trust

☐ Other _____

| Location of Business: | Business Description: |
| --- | --- |
| 6700 S. Centinela Blvd , 3rd floor<br>CULVER CITY, CA 90230 | FOR PROFIT ENTITY |

THESE DECLARATIONS TOGETHER WITH THE COVERAGE PART DECLARATIONS, THE COMMON POLICY
CONDITIONS, COVERAGE FORM(S), AND FORMS AND ENDORSEMENTS, IF ANY, COMPLETE THE ABOVE NUMBERED
POLICY.

## WESTERN WORLD INSURANCE GROUP

Western World Insurance Company
Tudor Insurance Company
Stratford Insurance Company

Administrative Office
400 Parson's Pond Drive
Franklin Lakes, New Jersey 07417-2600

We will provide the insurance described in this policy in return for the premium and compliance with all applicable
provisions of this policy. If required by state law, this policy shall not be valid unless countersigned by our authorized
representative.

Secretary

President

| Countersigned: | By |
| --- | --- |
| 03/10/2014   RENTKOGR | _____<br>Authorized Representative |

Page 2 of 2                                    WW230 (08/11)

WW 000042

RENTKO DEC - EXHIBIT B
Page 000045

## SCHEDULE OF FORMS AND ENDORSEMENTS

| POLICY NUMBER: | NAMED INSURED |
| BRL8000034 | Professional Collection Consultants |

Form/Endorsement No./Edition Date          Title   (Note- Titles are indications only. See actual form for correct name.)

```
WW230(08_11)          COMMON POLICY DECLARATIONS
WW22(02_13)           SERVICE OF SUIT
IL0017(11_98)         COMMON POLICY CONDITIONS
D-2(07_11)            CALIFORNIA NOTICE
WWCA01(12_11)         CALIFORNIA DISCLOSURE NOTICE PREMIUM REFUND
DEL02(10_11)          DIRECTORS OFFICERS INSURED ENTITY DECLARATIONS
DEL01(02_12)          DIRECTORS OFFICERS INSURED ENTITY COVERAGE FORM
DEL16(01_11)          PAYMENT OF DEFENSE COSTS REDUCES LIMITS OF INSURANCE
DEL17(03_10)          ASBESTOS EXCLUSION
DEL19(03_10)          POLICYHOLDER DISCLOSURE NOTICE OF TERRORISM INS CVG
DEL56(07_12)          BACKDATED PENDING AND PRIOR LITIGATION EXCLUSION
DEL74(10_11)          SHARED LIMITS ENDORSEMENT
DEL76(10_11)          PRIVATE COMPANY LIMITATION ENDORSEMENT
DEL88(10_11)          RELIANCE UPON ANOTHER'S APPLICATION ENDORSEMENT
DEL94(07_12)          EXTENDED REPORTING PERIOD ENDORSEMENT
DEL98(06_13)          SETTLEMENT AMENDATORY ENDORSEMENT
DEL100(08_13)         PENSION TRUST LIABILITY EXTENSION SHARED LIMIT
DEL102(08_13)         CRISIS MANAGEMENT ENDORSEMENT
```

ADDITIONAL FORMS AND ENDORSEMENTS

COMPANY

WW 000043

RENTKO DEC - EXHIBIT B
Page 000046

This Endorsement Modifies Your Policy.
Please Read It Carefully.

## SERVICE OF SUIT

The Company appoints the Commissioner of Insurance as its true and lawful attorney for acceptance of service of all legal process issued in this state in any action, suit or proceeding arising out of this contract of insurance.  The Company authorizes the Commissioner to forward such process to:

In California:    Richard Glucksman, Chapman Glucksman, 11900 West Olympic Boulevard, Suite 800, Los Angeles, CA 90064

In Rhode Island:  Paul DeCotis, DeCotis Insurance Associates, Inc., 245 Waterman Street, Suite 501, Providence, RI 02906

All Other States:  Morrison Cohen LLP, 909 Third Avenue, Dept. 65, New York, NY 10022

The above-named are authorized to accept service of process on behalf of the Company in any legal proceeding in the applicable state(s).

WW22 (02/13)

WW 000044

RENTKO DEC - EXHIBIT B
Page 000047

IL 00 17 11 98

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

## A. Cancellation

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. Examination Of Your Books And Records

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. Inspections And Surveys

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs 1. and 2. of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph 2. of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

## E. Premiums

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

## F. Transfer Of Your Rights And Duties Under This Policy

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

IL 00 17 11 98             Copyright, Insurance Services Office, Inc., 1998             Page 1 of 1     □

WW 000045

RENTKO DEC - EXHIBIT B
Page 000048

## CALIFORNIA NOTICE

1. THE INSURANCE POLICY THAT YOU HAVE PURCHASED IS BEING ISSUED BY AN INSURER THAT IS NOT LICENSED BY THE STATE OF CALIFORNIA. THESE COMPANIES ARE CALLED "NONADMITTED" OR "SURPLUS LINE" INSURERS.

2. THE INSURER IS NOT SUBJECT TO THE FINANCIAL SOLVENCY REGULATION AND ENFORCEMENT THAT APPLY TO CALIFORNIA LICENSED INSURERS.

3. THE INSURER DOES NOT PARTICIPATE IN ANY OF THE INSURANCE GUARANTEE FUNDS CREATED BY CALIFORNIA LAW. THEREFORE, THESE FUNDS WILL NOT PAY YOUR CLAIMS OR PROTECT YOUR ASSETS IF THE INSURER BECOMES INSOLVENT AND IS UNABLE TO MAKE PAYMENTS AS PROMISED.

4. THE INSURER SHOULD BE LICENSED EITHER AS A FOREIGN INSURER IN ANOTHER STATE IN THE UNITED STATES OR AS A NON-UNITED STATES (ALIEN) INSURER. YOU SHOULD ASK QUESTIONS OF YOUR INSURANCE AGENT, BROKER, OR "SURPLUS LINE" BROKER OR CONTACT THE CALIFORNIA DEPARTMENT OF INSURANCE AT THE FOLLOWING TOLL-FREE TELEPHONE NUMBER: 1-800-927-4357. ASK WHETHER OR NOT THE INSURER IS LICENSED AS A FOREIGN OR NON-UNITED STATES (ALIEN) INSURER AND FOR ADDITIONAL INFORMATION ABOUT THE INSURER. YOU MAY ALSO CONTACT THE NAIC'S INTERNET WEB SITE AT WWW.NAIC.ORG.

5. FOREIGN INSURERS SHOULD BE LICENSED BY A STATE IN THE UNITED STATES AND YOU MAY CONTACT THAT STATE'S DEPARTMENT OF INSURANCE TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.

6. FOR NON-UNITED STATES (ALIEN) INSURERS, THE INSURER SHOULD BE LICENSED BY A COUNTRY OUTSIDE OF THE UNITED STATES AND SHOULD BE ON THE NAIC'S INTERNATIONAL INSURERS DEPARTMENT (IID) LISTING OF APPROVED

D-2 (07/11)

WW 000046

RENTKO DEC - EXHIBIT B
Page 000049

NONADMITTED NON-UNITED STATES INSURERS.  ASK YOUR AGENT, BROKER, OR "SURPLUS LINE" BROKER TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.

7. CALIFORNIA MAINTAINS A LIST OF APPROVED SURPLUS LINE INSURERS.  ASK YOUR AGENT OR BROKER IF THE INSURER IS ON THAT LIST, OR VIEW THAT LIST AT THE INTERNET WEB SITE OF THE CALIFORNIA DEPARTMENT OF INSURANCE: WWW.INSURANCE.CA.GOV.

8. IF YOU, AS THE APPLICANT, REQUIRED THAT THE INSURANCE POLICY YOU HAVE PURCHASED BE BOUND IMMEDIATELY, EITHER BECAUSE EXISTING COVERAGE WAS GOING TO LAPSE WITHIN TWO BUSINESS DAYS OR BECAUSE YOU WERE REQUIRED TO HAVE COVERAGE WITHIN TWO BUSINESS DAYS, AND YOU DID NOT RECEIVE THIS DISCLOSURE FORM AND A REQUEST FOR YOUR SIGNATURE UNTIL AFTER COVERAGE BECAME EFFECTIVE, YOU HAVE THE RIGHT TO CANCEL THIS POLICY WITHIN FIVE DAYS OF RECEIVING THIS DISCLOSURE.  IF YOU CANCEL COVERAGE, THE PREMIUM WILL BE PRORATED AND ANY BROKER'S FEE CHARGED FOR THIS INSURANCE WILL BE RETURNED TO YOU.

WW 000047

RENTKO DEC - EXHIBIT B
Page 000050

## CALIFORNIA DISCLOSURE NOTICE
## PREMIUM REFUND

This Notice is to advise you that you may incur a penalty if you cancel your policy prior to the expiration date.

If you cancel the policy before the expiration date, the penalty is 10% of any remaining unearned premium, subject to any minimum earned premium endorsement that may be attached to your policy or the policy for which you are applying.

WW CAC1 (12/11)

WW 000048

RENTKO DEC - EXHIBIT B
Page 000051

## DIRECTORS, OFFICERS, INSURED ENTITY AND EMPLOYMENT PRACTICES INSURANCE COVERAGE PART

### THIS IS A CLAIMS MADE AND REPORTED COVERAGE

### DECLARATIONS

POLICY NUMBER: BRL2000024

**Policy Period: (Mo./Day/Yr.)**

From:  02/17/2014     To:  02/17/2015       12:01 AM, standard time

**COVERAGE A: DIRECTORS AND OFFICERS LIABILITY INSURANCE**

**ITEM 1.  LIMIT OF INSURANCE**

| | |
|---|---|
| Aggregate Limit | $ 1,000,000 |
| ITEM 2.  RETENTION (EACH CLAIM) | $ 15,000 |
| ITEM 3.  PREMIUM FOR COVERAGE A. | $ 13,799.00 |

IF THERE IS NO LIMIT OF INSURANCE SHOWN FOR ITEM 1., THIS POLICY
DOES NOT INCLUDE COVERAGE A. DIRECTORS AND OFFICERS LIABILITY INSURANCE.

**COVERAGE B: EMPLOYMENT PRACTICES LIABILITY INSURANCE**

**ITEM 4.  LIMIT OF INSURANCE**

| | |
|---|---|
| Aggregate Limit | $ 1,000,000 |
| ITEM 5.  RETENTION (EACH CLAIM) | $ 50,000 |
| ITEM 6.  PREMIUM FOR COVERAGE B. | $ 0.00 |

IF THERE IS NO LIMIT OF INSURANCE SHOWN FOR ITEM 4., THIS POLICY
DOES NOT INCLUDE COVERAGE B. EMPLOYMENT PRACTICES LIABILITY INSURANCE.

**TOTAL COVERAGE PART PREMIUM**

| | |
|---|---|
| Terrorism Risk Insurance Act of 2002 Premium | $ 0 |
| ITEM 7.  TOTAL COVERAGE PART PREMIUM | $ 13,799.00 |

**ITEM 8.  FORMS AND ENDORSEMENTS**

Forms and Endorsements applying to this Coverage Part and made part of the Policy at time of issue:

SEE SCHEDULE OF FORMS AND ENDORSEMENTS AND

THE INSURED'S APPLICATION FOR THIS INSURANCE.

THESE DECLARATIONS ARE PART OF THE POLICY DECLARATIONS CONTAINING THE NAME OF THE INSURED AND THE POLICY PERIOD.

DEL 02 (10/11)

WW 000049

RENTKO DEC - EXHIBIT B
Page 000052

# DIRECTORS, OFFICERS, INSURED ENTITY AND EMPLOYMENT PRACTICES INSURANCE COVERAGE FORM

**NOTICE: This is a Claims Made and Reported Coverage Form.**

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Common Policy Declarations. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any "individual insured" or "organization".

Other words and phrases that appear in quotation marks have special meaning. Refer to Section II - Definitions.

In consideration of the payment of the premium and reliance upon the statements made and information furnished to us as part of the "application", and subject to all the provisions of this policy, we agree to provide the insurance described in this Coverage Form and its applicable endorsements.

## SECTION I - INSURING AGREEMENTS

**1. Coverage A. Directors and Officers Liability**

We will pay on behalf of the insured all "loss" that the insured becomes legally obligated to pay because of a "claim" first made against the insured during the policy period for "wrongful acts":

  a. Arising solely out of the "individual insured's" performance of his or her duties on behalf of the "organization"; or

  b. Attributed to the "organization".

**2. Coverage B. Employment Practices Liability**

We will pay on behalf of the insured all "loss" that the insured becomes legally obligated to pay because of a "claim" first made against the insured during the policy period for "wrongful employment acts" or "third party wrongful acts":

  a. Arising solely out of the "individual insured's" performance of his or her duties on behalf of the "organization"; or

  b. Attributed to the "organization".

**3. Claims Made and Reported**

The insured must, as a condition precedent to coverage, report any "claim" to us as soon as practicable, but in no event later than 60 days after the expiration of the Coverage Part.

**4. Defense**

  a. We have the right and duty to defend the insured against any "claim" to which this insurance applies, even if the allegations of the "claim" are groundless, false or fraudulent. However, we will have no duty to defend the insured against any "claim" to which this insurance does not apply.

  b. "Defense costs" are payable in addition to the applicable Aggregate Limit of Insurance.

  c. Our right and duty to defend any "claim" ends when we have used up the applicable Aggregate Limit of Insurance in payment of "loss".

  d. We are not obligated to pay "defense costs":

    1) Incurred prior to "claim" notification; or

    2) To which we have not consented.

**5. Coverage Extensions**

  a. **Spousal Provision**

    This insurance also applies to the lawful spouse or "domestic partner" of an "individual insured", but only for "claims" arising out of any "wrongful acts", "wrongful employment acts" or "third party wrongful acts" of the "individual insured".

  b. **Worldwide Provision**

    This insurance applies to "wrongful acts", "wrongful employment acts" or "third party wrongful acts" occurring anywhere in the world provided the "claim" is first made against an insured in the United States of America (including its territories and possessions), Puerto Rico or Canada.

  c. **Outside Directorship**

    This insurance applies to "individual insureds" who hold an official position as a director in another nonprofit entity but only if it is with your specific, written permission. The nonprofit entity must qualify as such under Section 501 (c) of the Internal Revenue Code of 1986 (as amended). Exclusion 19. Other Capacity does not apply for the above situation. This coverage will be excess of any other insurance available to the "individual insured".

DEL 01 (02/12)

WW 000050

RENTKO DEC - EXHIBIT B
Page 000053

SECTION II - DEFINITIONS

1. "Application" means:

   a. An application, whether it is ours or another's, and any material submitted for this coverage; and

   b. Any application and materials submitted for all the previous policies issued by us providing you continuous coverage until the effective date of this policy.

2. "Claim" means:

   a. A written demand for monetary relief received by an insured seeking to hold the insured responsible for a "wrongful act", "wrongful employment act", or "third party wrongful act" including, but not limited to, the service of suit or the institution of arbitration or mediation proceedings against the insured;

   b. A judicial or administrative proceeding initiated against an insured seeking to hold the insured responsible for a "wrongful employment act" or a "third party wrongful act", including any proceeding conducted by the Equal Employment Opportunity Commission or similar federal, state or local agency and any appeal therefrom;

   c. A written demand for non-monetary or injunctive relief received by an insured seeking to hold the insured responsible for a "wrongful act", "wrongful employment act", or "third party wrongful act" including, but not limited to, the service of suit or the institution of arbitration or mediation proceedings against the insured;

   d. A civil proceeding against any insured seeking monetary damages or non-monetary or injunctive relief, commenced by the service of a complaint or similar pleading;

   e. A criminal proceeding against any insured, commenced by a return of an indictment or similar document, or receipt or filing of a notice of charges;

   f. A civil, administrative or regulatory proceeding against any insured commenced by the filing of a notice of charges or similar document;

   g. A civil, criminal, administrative or regulatory investigation commenced by the service upon or other receipt by any "individual insured" of a written notice, investigative order, or subpoena from the investigating authority identifying such "individual insured" as an individual, against whom a proceeding described in paragraphs c., d., or e. immediately above may be commenced; or

   h. A written request of the insured to toll a statute of limitations relating to a "claim" described in paragraphs a. through g. immediately above.

A "claim" will be considered first made when an insured or its legal representative or agent first receives written notice of a "claim". If more than one "claim" arises out of the same "wrongful act", "wrongful employment act" or "third party wrongful act", or if an "interrelated claim", we will consider all the "claims" to be first made on the date the earliest of the "claims" was made.

3. "Construction defect(s)" means any actual or alleged defective, faulty, or delayed construction or any other matter constituting a construction defect under applicable law, regardless of whether it results from:

   a. Defective or incorrect architectural plans or other designs;

   b. Defective or improper soil testing;

   c. Defective, inadequate or insufficient protection from subsoil or earth movement or subsidence;

   d. Construction, manufacture or assembly of any tangible property;

   e. The failure to provide or pay for any construction-related goods or services; or

   f. The supervision or management of any construction-related activities.

4. "Defense costs" means reasonable and necessary fees, costs and expenses resulting from the defense and appeal of any "claim" against the insured, excluding salaries and bonuses of the "organization's" officers or "employees." "Defense costs" includes premiums for any appeal bond, attachment bond or similar bond.

5. "Discrimination" means:

   a. The termination of an employment relationship; or

   b. A demotion or failure to hire or promote an individual; or

   c. Any other limitation or classification of an "employee" or applicant for employment which would deprive any individual of employment opportunities or adversely affect any individual's status as an "employee";

because of race, color, religion, age, sex, disability, pregnancy, national origin, marital status, sexual orientation or other protected class or characteristic established under applicable federal, state or local statute, ordinance, regulation or order.

6. "Domestic partner" means any natural person qualifying as a domestic partner under the provisions of any applicable federal, state or local law.

7. "Employee" means any natural person whose labor or service is engaged by and directed by the "organization" while performing duties related to the conduct of the "organization's" business. "Employee" includes leased, part-time, seasonal and temporary workers, volunteers and interns.

DEL 01 (02/12)

WW 000051

RENTKO DEC - EXHIBIT B
Page 000054

8. **"Harassment"** means:

   a. Sexual harassment, including unwelcome sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature, that is made a condition of employment, is used as a basis for employment decisions, or creates a work environment that is hostile, intimidating or offensive or that otherwise interferes with performance; or

   b. Other harassment which creates a work environment that is hostile, intimidating or offensive or that otherwise interferes with performance.

9. **"Individual insureds"** means any person(s) who were, now are, or will be directors, trustees, officers, "employees", or committee members of the "organization", including their estates, heirs, legal representatives or assigns in the event of their death, incapacity or bankruptcy.

10. **"Interrelated claims"** means all "claims" based upon or arising from "wrongful acts", "wrongful employment acts," or "third party wrongful acts" that have in common any fact, circumstance, situation, event, transaction, cause or series of causally or logically connected facts, circumstances, situations, events, transactions or causes.

11. **"Loss"** means damages and settlements which an insured is legally obligated to pay as a result of a "claim" for a "wrongful act" or "wrongful employment act", or "third party wrongful act", pre-judgment and post-judgment interest awarded by a court and punitive or exemplary damages to the extent such damages are insurable under applicable law.

   For the purpose of determining the insurability of punitive damages and exemplary damages, the laws of the jurisdiction most favorable to the insurability of the damages will control, provided that the jurisdiction has a substantial relationship to the relevant insured or to the "claim" giving rise to the damages.

   "Loss" does not include fines, penalties, taxes, the multiplied portion of any multiple damage award or damages owed based on an express obligation by written or oral agreement or amounts owed under any contract or agreement. In addition, "loss" does not include the cost to modify or provide any accommodation to any disabled person or the cost to conduct any program, procedure or training.

   "Loss" also means, with respect to any "claim" arising out of a "wrongful employment act" or "third party wrongful act", front-pay and back-pay, and liquidated damages awarded pursuant to the Age Discrimination in Employment Act, the Equal Pay Act or the Family Medical Leave Act.

   In addition, "loss" does not include:

   a. Employment-related benefits, retirement benefits, improper payroll deductions, severance pay, unpaid wages and commissions, compensation for vacation and sick days, medical and insurance benefits, and overtime pay for hours actually worked or labor actually performed by any "employee" of the "organization";

   b. Deferred cash incentive compensation or any other type of compensation other than salary, wages, bonuses, commissions, non-deferred cash incentive compensation; and

   c. Liquidated damages, except to the extent specifically included above.

   In addition, "loss" does not include the cost of any remedial, preventative or other non-monetary relief, including but not limited to any costs associated with compliance with any such relief of any kind or nature imposed by any judgment, settlement or governmental authority.

12. **"Organic pathogen"** means any organic irritant or contaminant, including but not limited to mold, fungus, bacteria or virus, or any of their by-products such as mycotoxin, mildew, or biogenic aerosol.

13. **"Organization"** means you and your "subsidiaries" and includes a debtor-in-possession or the bankruptcy estate of the "organization" under United States bankruptcy law or an equivalent status under the law of any other jurisdiction.

14. **"Personal injury offense"** means:

   a. False arrest, detention or imprisonment;

   b. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor; or

   c. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services.

15. **"Retaliation"** means any actual or alleged retaliatory treatment against an "employee" because of:

   a. The exercise of, or attempt to exercise, an "employee's" rights under law; or

   b. An "employee's" disclosure of, or threat to disclose to a governmental agency or superior, acts of actual or alleged wrongdoing by an insured; or

   c. The filing of a claim under federal, state or local whistle-blower laws including the federal False Claims Act.

16. **"Subsidiary"** means any entity, as of the effective date of the policy, in which you own or control, directly or indirectly, the right to elect or appoint more than fifty percent of the entity's directors, trustees, or managers, and that entity is named in the "application".

DEL 01 (02/12)

WW 000052

RENTKO DEC - EXHIBIT B
Page 000055

17. **"Third party wrongful act"** means "discrimination", including "harassment", by any insured against any natural person who is not an "employee".

18. **"Whistleblower conduct"** means any of the activity set forth in 18 U.S.C. Sec. 1514A(a), engaged in by a whistleblower with a federal regulatory or law enforcement agency, Member of Congress or any committee of Congress, or person with supervisory authority over the whistleblower, or an enforcement action by the whistleblower set forth in 18 U.S.C. Sec. 1514A(b).

19. **"Wrongful act"** means any actual or alleged act, error, omission, misstatement, misleading statement, neglect, breach of duties, "personal injury offense" or violations of the Sherman Antitrust Act or similar federal, state or local statutes or rules.

  a. By the "organization"; or

  b. By an "individual insured", arising solely from duties conducted on behalf of the "organization"; or

  c. Asserted against an "individual insured" because of an actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duties by the "organization".

  A "wrongful act" does not include any "wrongful employment act" or "third party wrongful act".

20. **"Wrongful employment act"** means any actual or alleged act of the following:

  a. "Discrimination"; or

  b. "Harassment"; or

  c. "Retaliation"; or

  d. "Wrongful termination"; or

  e. Violation of the Uniformed Services Employment & Reemployment Rights Act; or

  f. Violation of the Family and Medical Leave Act of 1993; or

  g. Violation of state law having the same or substantially similar purpose as the Acts in e. and f. above; or

  h. Acts described in clauses a. through g. above, arising from the use of the "organization's" Internet, e-mail, telecommunication or similar systems, including the failure to provide and enforce adequate policies and procedures relating to use of the "organization's" Internet, e-mail, telecommunication or similar systems.

21. **"Wrongful termination"** means termination of an employment relationship in a manner which is illegal and wrongful or in breach of an implied agreement to continue employment. However, "wrongful termination" does not include any breach of a written employment contract.

**SECTION III - EXCLUSIONS**

This insurance does not apply to any "loss" or "defense costs" in connection with any "claim" made against an insured, arising out of, directly or indirectly resulting from, or in consequence of, or in any way involving:

1. **Bodily Injury or Property Damage**

  Any actual or alleged bodily injury, sickness, humiliation, mental anguish, emotional distress, assault, battery, disease or death of a person, or theft, conversion, misappropriation, damage to or destruction of any tangible property including any loss of use or slander of title. This exclusion does not apply to "claims" for mental anguish, emotional distress, invasion of privacy, or humiliation, that result from a "wrongful employment act" or "third party wrongful act".

2. **Professional Liability**

  Medical malpractice or counseling or any error or omission by a professional while rendering services, including the failure to render services.

3. **Contractual Liability**

  Liability under any contract or agreement except liability that would exist even in the absence of the contract or agreement.

4. **Pending and Prior Litigation**

  Any litigation pending as of or prior to the effective date of this policy; provided that, if this policy is a renewal of a policy or policies previously issued by us and if the coverage provided by us was continuous from the effective date of the first policy to the effective date of this policy, the reference in this exclusion to effective date will mean the effective date of the first policy under which we first provided continuous coverage to you.

5. **Prior Knowledge**

  Any actual or alleged act, error or omission, breach of duty or circumstance that an insured:

  a. Had knowledge of prior to the effective date of the policy; and

  b. Had a reasonable belief the actual or alleged act, error or omission, breach of duty or circumstance could result in a "claim".

6. **Pollution**

  The actual, alleged or threatened discharge, dispersal, release or escape of pollutants, or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants.

WW 000053

RENTKO DEC - EXHIBIT B
Page 000056

Pollutants include, but are not limited to, any solid, liquid, gaseous or thermal irritant or contaminant, including "organic pathogens", smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.

7. **Nuclear, Biological and Chemical Materials**

    a. The use, release or escape of nuclear materials, or any resulting nuclear reaction or radiation or radioactive contamination; or

    b. The dispersal or application of pathogenic or poisonous biological or chemical materials.

8. **Construction Defect**

    Any "construction defect".

9. **Fraud**

    Any fraudulent, dishonest, or criminal act. However, this exclusion does not apply to "defense costs" incurred until such conduct is established to be fraudulent, dishonest or criminal.

    The "wrongful act" of any "individual insured" will not be imputed to any other "individual insured".

10. **Illegal Profits**

    The gain of any profits, remuneration or advantage to which an insured was not legally entitled. However, this exclusion does not apply to "defense costs" incurred until a final and non-appealable judgment or adjudication is rendered against the insured as to this conduct.

    The "wrongful act" of any "individual insured" will not be imputed to any other "individual insured".

11. **Builders and Developers**

    Operations performed, completed, or being conducted, by or on behalf of the builder, developer or sponsor, including damages arising out of designs, surveys or engineering services performed by or on behalf of the builder, developer or sponsor.

12. **Labor Disputes and Negotiations**

    Any lockout, strike, picket line, replacement of worker(s) or other similar actions resulting from labor disputes or labor negotiations. However, this exclusion does not apply to a "claim" for actual or alleged "retaliation" from the foregoing.

13. **Labor Relations Acts**

    a. The Fair Labor Standards Act (except the Equal Pay Act);

    b. The National Labor Relations Act;

    c. The Worker Adjustment and Retraining Notification Act;

    d. The Consolidated Omnibus Budget Reconciliation Act of 1985;

    e. The Occupational Safety and Health Act;

    f. Any workers' compensation, unemployment insurance, social security, or disability benefits law;

    g. The Racketeering Influence and Corrupt Organizations Act;

    h. The Federal False Claims Act; or

    i. Other similar provisions of any federal, state or local or common law or any rules or regulations promulgated under any of the foregoing.

However, this exclusion does not apply to a "claim" for actual or alleged "retaliation" arising from your violation of such law.

14. **ERISA**

    Any pension, profit sharing, welfare benefit or other employee benefit program established in whole or part for the benefit of any "individual insured", or based upon, arising out of or in any way involving the Employee Retirement Income Security Act of 1974 (except Section 510 thereof) or any amendments to the Act or regulations promulgated thereunder or similar provisions of any federal, state or local law or common law. However, this exclusion does not apply to any "claim" for actual or alleged "retaliation" with regards to benefits paid or payable.

15. **Copyright, Patent or Trademark Infringement**

    Infringement of a copyright, patent or trademark.

16. **Accommodations for Disabled Persons**

    Any alleged or actual failure of any building or property to comply with any federal, state or other statute or code which requires any building or property to be more accessible or accommodating to any disabled person.

17. **Insured vs. Insured**

    Any "claim" by, at the behest of, or on behalf of the "organization" or any "individual insured". However, this exclusion does not apply to:

    a. A "claim" brought by an "individual insured" for a "wrongful employment act";

    b. Any derivative "claim" made on behalf of the "organization" by a member, an attorney general or any other such representative party if such action is brought and maintained totally independently of and totally without the solicitation, assistance, active participation or intervention of any "individual insured" or the "organization". However, that "whistleblower conduct" by an "individual insured", other than a director or equivalent position, will not be considered solicitation, assistance, active participation, or intervention of an "individual insured";

DEL 01 (02/12)

WW 000054

RENTKO DEC - EXHIBIT B
Page 000057

c. Any "claim" that is brought or maintained by any bankruptcy or insolvency trustee or bankruptcy appointed representative of the "organization", or receiver, examiner, liquidator or similar official for the "organization";

d. Any "claim" that is brought or maintained by any insured in the form of a cross claim, third party claim or other proceeding for contribution or indemnity which is part of, and directly results from a "claim" that is covered by this coverage form; or

e. Any "claim" that is brought or maintained by any former director or officer of the "organization" and where the "claim" is solely based upon and arising out of "wrongful acts" committed subsequent to the date such director or officer ceased to be a director or officer of the "organization" and where the "claim" is first made 4 years subsequent to the date such director or officer ceased to be a director or officer of the "organization".

### 18. Written Employment Contracts

Any actual or alleged breach of an express obligation set forth in a written employment contract.

### 19. Other Capacity

Any act or omission by an insured in his or her capacity with an entity other than the "organization".

### 20. Lobbying Activities

Any attempt to influence legislators or officials, or decisions made by a governmental entity including payments, political contributions, commissions, gratuities, benefits or any other favors to or for the benefit of any officials, agents, representatives or employees, including family members, of any governmental entity or any entity with which they are affiliated.

### 21. Securities Liability Exclusion

A violation or alleged violation of (1) the Federal Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Company Act of 1940, or any other federal law with respect to the regulation of securities; (2) any state securities or blue sky law; or (3) any provision of the common law imposing liability in connection with the offer, sale, or purchase of securities.

### 22. Unpaid Compensation

Improper payroll deductions, unpaid wages, misclassification of exempt or non-exempt employee status, compensation earned by or due to the claimant but not paid by the insured (including, but not limited to, commission, vacation and sick days, retirement benefits, and severance pay), overtime pay for hours actually worked or labor actually performed by any "employee" of the "organization". However, this exclusion does not apply to any back pay or front pay allegedly due as the result of "discrimination", or that part of any "claim" alleging "retaliation".

## SECTION IV - LIMITS OF INSURANCE

1. The Limits of Insurance shown in the Declarations and the rules below determine the most we will pay regardless of the number of:

   a. Insureds;

   b. "Claims" made; or

   c. Persons or organizations making "claims".

2. The Directors and Officers Aggregate Limit is the most we will pay under Coverage A for all "loss", due to "wrongful act" "claims".

3. The Employment Practices Aggregate Limit is the most we will pay under Coverage B for all "loss", due to "wrongful employment act" or "third party wrongful act" "claims".

4. If both Coverage A and Coverage B apply to the same "claim" or "interrelated claim", the largest aggregate limit from one of the Coverages will be the maximum Limit of Insurance available for the "claim" or "interrelated claim".

The Limits of Insurance for this Coverage Part apply separately to each consecutive annual period starting with the beginning of the policy period shown in the Common Policy Declarations. However, if:

a. This Coverage Part is issued for a period of more than twelve months but less than twenty-four months; or

b. The policy period is extended after issuance for an additional period of less than twelve months,

then the time periods exceeding the standard twelve-month policy period described in a. and b. will be deemed part of the last preceding period for the purpose of determining the Limits of Insurance.

Any Extended Reporting Period, if applicable, will be deemed part of the last policy period for the purpose of determining the Limits of Insurance.

## SECTION V - RETENTION

1. For each "claim":

   a. The insured is responsible for the total of "loss" and "defense costs" up to the applicable Retention shown in the Coverage Part Declarations;

   b. We will only pay for "loss" and/or "defense costs" if the total of "loss" and "defense costs" that is otherwise payable under this insurance exceeds the applicable Retention shown in the Coverage Part Declarations.

2. If we, at our sole discretion, elect to pay any part or all of the Retention, the insured must repay this amount to us upon demand.

WW 000055

RENTKO DEC - EXHIBIT B
Page 000058

3. Any Retention shown in the Coverage Part Declarations is not applicable to a "claim" for which an "individual insured" is not indemnified by you.

4. Solely with respect to the above, we agree that we will not seek to rescind the policy with respect to any "individual insured" who did not know the facts misrepresented or omitted.

5. You must indemnify an "individual insured" to the fullest extent permitted by law and must take all necessary steps to do so. Paragraph 3. does apply if you cannot legally indemnify an "individual insured" because of the appointment by a state or federal official, agency or court of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to take control of, supervise, manage or liquidate you, or because you become a debtor-in-possession.

## SECTION VI - CONDITIONS

### A. CLAIMS CONDITIONS

1. **Insured's Duties When There Is a "Claim"**

   As a condition precedent to the right of coverage provided by this Coverage Part, the insured must do the following:

   a. If a "claim" to which this Coverage Part applies is made against an insured, the insured must give written notice, as soon as practicable, but in no event later than 60 days after the expiration of the Coverage Part to:

   Western World Insurance Group
   400 Parson's Pond Drive
   Franklin Lakes, NJ 07417
   Attn: Claims Department

   Written notice must include every demand, notice, summons or other process received directly by the insured or the insured's representatives.

   b. Cooperate with us. We may require that the insured submit to examination under oath, produce and make available all records, documents and other materials, and attend hearings, depositions and trials. The insured must assist us in effecting settlement, securing and providing evidence and obtaining the attendance of witnesses.

   c. Not admit liability, settle any claims, or assume any obligations without our prior written consent.

2. **Reporting of a Possible "Claim"**

   If during the policy period, any insured first becomes aware of a specific "wrongful act", "wrongful employment act" or "third party wrongful act" that could result in a "claim" and gives written notice to us during the policy period of:

   a. The potential claimant's name and address; and

   b. A chronological description of the events that are involved; and

   c. An explanation of the type of "claim" that is anticipated,

   then any "claim" arising out of the "wrongful act" or "wrongful employment act" or "third party wrongful act" which is subsequently made against the insured will be deemed to have been made at the time we received the written notice from the insured. . .

### B. GENERAL CONDITIONS

1. **When We Do Not Renew**

   If we decide not to renew this Coverage Part, we will mail or deliver to you written notice of the nonrenewal not less than 30 days before the expiration date.

   If notice is mailed, proof of mailing will be sufficient proof of notice.

2. **Extended Reporting Period**

   a. If this Coverage Part is cancelled or not renewed, you have the right to purchase an Extended Reporting Period. The Extended Reporting Period applies only to "claims" for a "wrongful act", "wrongful employment act" or "third party wrongful act" committed prior to the termination of this coverage and otherwise insured by this Coverage Part. However, you must notify us in writing of your decision to purchase the Extended Reporting Period and the premium must be paid within 30 days of the termination date of this coverage. The right to purchase an Extended Reporting Period does not apply if the cancellation was for non-payment of premium or non-compliance with the terms of this Coverage Part.

   b. The premium for the Extended Reporting Period endorsement will be computed according to the following percentages based on the annual premium amount of this Coverage Part:

   A one-year Extended Reporting Period for 30% of the expiring premium;

   A two-year Extended Reporting Period for 75% of the expiring premium;

   A three-year Extended Reporting Period for 120% of the expiring premium.

   c. The Extended Reporting Period cannot be cancelled or renewed.

WW 000056

RENTKO DEC - EXHIBIT B
Page 000059

d. The additional premium for the Extended Reporting Period is fully earned at the inception of the Extended Reporting Period.

e. Coverage for a "claim" or circumstances which ultimately lead to a "claim" first received and reported during the Extended Reporting Period will be in excess over any other valid and collectible insurance providing coverage for that "claim".

f. The Extended Reporting Period does not reinstate or increase the Limits of Insurance available under this Coverage Part.

g. The Extended Reporting Period begins on the effective date of cancellation or non-renewal of the policy.

3. **Order of Payments**

In the event payment of "loss" is due under this Coverage Part but the amount of the "loss" exceeds the remaining available Limit of Insurance specified in the Declarations, we will, to the extent of any remaining amount of the Limit of Insurance available:

a. First pay for "loss" on behalf of the "individual insured" for which coverage is provided; then

b. Pay for "loss" on behalf of the "organization" for which coverage is provided.

4. **Transfer of Rights of Recovery Against Others to Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do everything necessary to secure our rights and must do nothing to impair them.

5. **Other Insurance**

This insurance will be excess over any other valid and collectible insurance, unless the other insurance is specifically written to be in excess of this Coverage Part.

6. **Terms of Coverage Part Conformed to Statute**

Terms of this Coverage Part which are in conflict with the statutes of the state in which this policy is issued, are hereby amended to conform to those statutes.

7. **Transactions**

a. If after the effective date of this Coverage Part

(1) You merge into, or consolidate with, another entity and you are not the surviving entity; or

(2) Another entity, person or group of entities and/or persons acting in concert acquires more than fifty percent of your assets; or

(3) Another entity, person or group of entities and/or persons acting in concert acquires the right to elect or select a majority of your directors, trustees, or managers; or

(4) You sell all or substantially all of your assets,

this Coverage Part will continue in effect until the expiration date of the policy, or the effective date of non-renewal, if applicable, with respect to "wrongful acts", "wrongful employment acts" or "third party wrongful acts" occurring before the transaction, but there is no coverage under this policy for actual or alleged "wrongful acts", "wrongful employment acts" or "third party wrongful acts" occurring on or after the transaction.

b. You must give us written notice of the transaction as soon as practicable, but not later than 30 days after the effective date of the transaction.

The entire premium for this coverage is fully earned on the transaction date. In the event of a transaction, you will have the right to an offer of coverage from us for an Extended Reporting Period to report "wrongful acts", "wrongful employment acts" or "third party wrongful acts" occurring prior to the effective date of the transaction.

DEL 01 (02/12)

WW 000057

RENTKO DEC - EXHIBIT B
Page 000060

This Endorsement Modifies Your Policy.
Please Read It Carefully.

## PAYMENT OF "DEFENSE COSTS" REDUCES LIMITS OF INSURANCE

This endorsement modifies insurance provided under the following:

DIRECTORS, OFFICERS, INSURED ENTITY AND EMPLOYMENT PRACTICES
INSURANCE COVERAGE PART

This Coverage Part is changed as follows:

Section I. Insuring Agreements, Paragraph 4. Defense is deleted and replaced with:

4. Defense:

a. We have the right and duty to defend the insured against any "claim" to which this insurance applies, even if the allegations of the "claim" are groundless, false or fraudulent. However, we will have no duty to defend the insured against any "claim" to which this insurance does not apply.

b. Payments for "defense costs" will reduce the applicable Aggregate Limit of Insurance.

c. Our right and duty to defend any "claim" ends when we have used up the applicable Aggregate Limit of Insurance in payment of "defense costs" and "loss"

d. We are not obligated to pay "defense costs":

1) Incurred prior to "claim" notification; and

2) To which we have not consented.

Section IV – Limits of Insurance; Paragraphs 2. and 3. are amended to read:

2. The Directors and Officers Aggregate Limit is the most we will pay under Coverage A for the sum of all "defense costs" and "loss" due to "claims".

3. The Employment Practices Aggregate Limit is the most we will pay under Coverage B for the sum of all "defense costs" and "loss" due to "claims".

DEL 16 (01/11)

WW 000058

RENTKO DEC - EXHIBIT B
Page 000061

**This Endorsement Modifies Your Policy**
(Effective At Inception Unless Another Date Shown Below)

## ASBESTOS EXCLUSION (TOTAL ASBESTOS EXCLUSION)

This endorsement modifies insurance provided under the following:

**DIRECTORS, OFFICERS, INSURED ENTITY AND EMPLOYMENT PRACTICES INSURANCE COVERAGE PART**

This insurance does not apply to any payment for "loss" or "defense costs" in connection with any "claim" made against an insured, arising out of, directly or indirectly resulting from, or in consequence of, or in any way involving:

1. The specifications of any product, material or process containing asbestos; or

2. The failure to detect the existence of, or determine the amount of, asbestos in any product, material or process; or

3. The failure to warn of the existence of asbestos in any product, material or process; or professional services rendered in the abatement, replacement or removal of any product, material or process containing asbestos; or

4. The failure to recommend the removal of asbestos in any product, material or process; or

5. Any other alleged failure to properly act in response to the presence of asbestos in any product, material or process; or

6. Professional services rendered in the abatement, replacement or removal of any product, material or process containing asbestos.

All other terms and conditions of the policy remain unchanged.

(Complete this section if endorsement is added after policy is issued.)

| Policy Number | Endorsement Number | Endorsement Effective Date |
| --- | --- | --- |
| Signature of Authorized Representative | | Producer Number |

DEL 17 (03/10)

WW 000059

RENTKO DEC - EXHIBIT B
Page 000062

This Endorsement Modifies Your Policy

**POLICYHOLDER DISCLOSURE**
**NOTICE OF TERRORISM INSURANCE COVERAGE**

This disclosure form applies to insurance provided under the following:

DIRECTORS, OFFICERS, INSURED ENTITY AND EMPLOYMENT
PRACTICES INSURANCE COVERAGE PART

You are hereby notified that under the Terrorism Risk Insurance Act, as amended, that you have a right to purchase insurance coverage for losses resulting from acts of terrorism, as defined in Section 102(1) of the Act: The term "act of terrorism" means any act that is certified by the Secretary of the Treasury – in concurrence with the Secretary of State, and the Attorney General of the United States – to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

YOU SHOULD KNOW THAT WHERE COVERAGE IS PROVIDED BY THIS POLICY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM, SUCH LOSSES MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES GOVERNMENT UNDER A FORMULA ESTABLISHED BY FEDERAL LAW. HOWEVER, YOUR POLICY MAY CONTAIN OTHER EXCLUSIONS WHICH MIGHT AFFECT YOUR COVERAGE, SUCH AS AN EXCLUSION FOR NUCLEAR EVENTS. UNDER THIS FORMULA, THE UNITED STATES GOVERNMENT GENERALLY PAYS 85% OF COVERED TERRORISM LOSSES EXCEEDING THE STATUTORILY ESTABLISHED DEDUCTIBLE PAID BY THE INSURANCE COMPANY PROVIDING THE COVERAGE. THE PREMIUM CHARGED FOR THIS COVERAGE IS PROVIDED BELOW AND DOES NOT INCLUDE ANY CHARGES FOR THE PORTION OF LOSS THAT MAY BE COVERED BY THE FEDERAL GOVERNMENT UNDER THE ACT.

YOU SHOULD ALSO KNOW THAT THE TERRORISM RISK INSURANCE ACT, AS AMENDED, CONTAINS A $100 BILLION CAP THAT LIMITS U.S. GOVERNMENT REIMBURSEMENT AS WELL AS INSURERS' LIABILITY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM WHEN THE AMOUNT OF SUCH LOSSES IN ANY ONE CALENDAR YEAR EXCEEDS $100 BILLION. IF THE AGGREGATE INSURED LOSSES FOR ALL INSURERS EXCEED $100 BILLION, YOUR COVERAGE MAY BE REDUCED.

Terrorism coverage as described above is provided for a premium of $ 0 .

All other terms and conditions of the Policy remain unchanged.

DEL 19 (03/10)

WW 000060

RENTKO DEC - EXHIBIT B
Page 000063

This Endorsement Modifies Your Policy.
Please Read It Carefully.

## BACKDATED PENDING AND PRIOR LITIGATION EXCLUSION

This endorsement modifies insurance provided under the following:

DIRECTORS, OFFICERS, INSURED ENTITY AND EMPLOYMENT PRACTICES INSURANCE COVERAGE PART

Section III, EXCLUSIONS, subsection 4., Pending and Prior Litigation, is deleted in its entirety and replaced with the following:

4.  Pending and Prior Litigation

Any litigation pending as of or prior to 2/17/2010, or alleging or derived from the same or essentially the same facts as alleged in such pending or prior litigation.

DEL56 (07/12)

WW 000061

RENTKO DEC - EXHIBIT B
Page 000064

*This Endorsement Modifies Your Policy.*
*Please Read It Carefully.*

## SHARED LIMITS ENDORSEMENT

This endorsement modifies insurance provided under the following:

> DIRECTORS, OFFICERS, INSURED ENTITY AND EMPLOYMENT PRACTICES INSURANCE COVERAGE PART

**Section IV - LIMITS OF INSURANCE** is amended by adding the following:

3.  Notwithstanding Subsections 2. and 3. to the contrary, our maximum Aggregate Limit of Insurance, as stated on the Coverage Part Declarations, for the sum of all "loss" and "defense costs" for all "claims" or "interrelated claims" made under Coverages A. and B. will be $ 1,000,000.

DEL74 (10/11)

WW 000062

RENTKO DEC - EXHIBIT B
Page 000065

This Endorsement Modifies Your Policy.
Please Read It Carefully.

## PRIVATE COMPANY LIMITATION ENDORSEMENT

This endorsement modifies insurance provided under the following:

> DIRECTORS, OFFICERS, INSURED ENTITY AND EMPLOYMENT PRACTICES INSURANCE COVERAGE PART

SECTION II - DEFINITIONS is amended by adding the following definitions:

1. "Securities" means common or preferred stock or rights, warrants or options in such stock representing an ownership interest in the "organization" or a right to acquire or dispose of such interest; or notes, bonds or debentures representing a debt owed by the "organization" to the extent such instruments would be deemed "securities" under the federal or state laws of the United States.

2. "Takeover" means:

   a. The acquisition by any person or entity of all or substantially all of your assets, or of more than 50% of your outstanding "securities" representing the present right to vote for the election of directors; or

   b. The merger or consolidation of you into another entity such that you are not the surviving entity.

SECTION III - EXCLUSIONS is amended as follows:

The following exclusions are added to the section:

This insurance does not apply to any "loss" or "defense costs" in connection with any "claim" made against an insured, arising out of, directly or indirectly resulting from, or in consequence of, or in any way involving:

1. Any public offering of "securities" undertaken or consummated by or on behalf of you, or the solicitation, sale, purchase, distribution, or issuance of any such "securities", whether any such activity occurs or allegedly occurs prior to, during, or after such public offering. However, this exclusion does not apply to "claims" arising from an offer, sale or purchase of "securities" in a transaction that is exempt from registration under the Securities Act of 1933, or any amendments thereto or any rules and regulations promulgated thereunder.

2. Any goods or products manufactured, produced, processed, packaged, sold, marketed, distributed, advertised or developed by you.

3. The return by any of the "individual insureds" of any remuneration paid to them without the previous approval of the appropriate governing body of you or any other entity where an "individual insured" holds an official position as a director, which payment without such previous approval will be held to be in violation of law.

4. Any "wrongful act" actually or allegedly committed subsequent to a "takeover"

DEL76 (10/11)

WW 000063

RENTKO DEC - EXHIBIT B
Page 000066

This Endorsement Modifies Your Policy.
Please Read It Carefully.

## PENSION TRUST LIABILITY INSURANCE COVERAGE EXTENSION
### (SHARED AGGREGATE LIMIT)

This endorsement modifies insurance provided under the following:

**DIRECTORS, OFFICERS, INSURED ENTITY AND EMPLOYMENT PRACTICES INSURANCE COVERAGE PART**

The Directors, Officers, Insured Entity and Employment Practices Insurance Coverage Part Declarations are amended with the addition of the following:

### PENSION TRUST LIABILITY INSURANCE COVERAGE

| | |
|---|---|
| PENSION TRUST LIABILITY AGGREGATE LIMIT: | $ 1,000,000 |
| "VOLUNTARY COMPLIANCE LOSS" SUB-LIMIT: | $ 25,000 |
| "HIPAA PENALTIES" SUB-LIMIT: | $ 25,000 |
| RETENTION (EACH CLAIM): | $ 0 |

**SECTION I - INSURING AGREEMENTS** is amended by adding the following:

### Coverage C. Pension Trust Liability

We will pay on behalf of the "fiduciary insured" all "loss" that the "fiduciary insured" becomes legally obligated to pay because of a "claim" first made against the "fiduciary insured" during the policy period for "fiduciary wrongful acts":

a. Arising solely out of the "individual insured's" performance of his or her duties on behalf of the "plan"; or

b. Attributed to the "organization".

Further, we will:

a. Pay the "voluntary compliance loss" and "delinquent filer penalties";

b. Reimburse the "voluntary fiduciary correction expense"; and

c. Pay the "HIPAA penalties"

of the "fiduciary insureds" which the "fiduciary insureds" have become legally obligated to pay by reason of a "claim" first made against the "fiduciary insureds" during the policy period or, if elected, the Extended Reporting Period, and reported to us, for any "fiduciary wrongful act" taking place prior to the end of the policy period, but only up to the Sub-Limit for "voluntary compliance loss" and "HIPAA penalties" as set forth above.

**SECTION II - DEFINITIONS** is amended as follows:

Definition 2, "Claim", is amended by adding the following:

"Claim" also means a civil proceeding or formal investigation brought by the U.S. Department of Labor, the U.S. Pension Benefit Guaranty Corporation, or any similar federal, state or local governmental body, including any appeal therefrom.

"Claim" also includes a written request to toll or waive any statute of limitations.

WW 000064

RENTKO DEC - EXHIBIT B
Page 000067

Definition 9, "Individual insureds", is amended by adding the following:

"Individual insureds" also means:

a. Any person(s) who was, now is, or will become a trustee, director, officer, fiduciary or "employee" of any "plan" except one who is a lawyer, accountant, actuary, or investment advisor not employed as such on a full time basis by the "organization"; or

b. Any person(s) for whose "fiduciary wrongful acts" any of the "fiduciary insureds" are legally responsible for and included by specific written endorsement to this policy, provided further that such "fiduciary insured" is sued solely in his or her capacity as a fiduciary of the "plan".

Definition 11, "Loss", is deleted and replaced with the following:

"Loss" means damages and settlements which an insured is legally obligated to pay as a result of a "claim" for a "fiduciary wrongful act", pre-judgment and post-judgment interest awarded by a court and punitive or exemplary damages to the extent such damages are insurable under applicable law.

For the purposes of determining the insurability of punitive damages and exemplary damages, the laws of the jurisdiction most favorable to the insurability of the damages will control, provided that the jurisdiction has a substantial relationship to the relevant insured or to the "claim" giving rise to the damages.

"Loss" also includes:

a. The 5% or less, or the 20% or less, civil penalties imposed upon a "fiduciary insured" as a fiduciary under sections 502(i) or (l) of the Employee Retirement Income Security Act of 1974, as amended, or any similar state or local common or statutory law, and any rules and regulations promulgated thereunder;

b. "Voluntary compliance loss";

c. "Delinquent filer penalties";

d. "Voluntary fiduciary correction expenses"; and

e. "HIPAA penalties".

"Loss" does not include any other fines, penalties or taxes or costs associated with any compliance imposed by any judgment, settlement or government authority other than those expressly listed above.

"Loss" does not include the multiplied portion of any multiple damage award or damages owed based on an express obligation by written or oral agreement or amounts owed under any contract or agreement. "Loss" does not include any sum, amount or payment which constitutes restitution or disgorgement including the return of any fees or expenses in the "administration" of any "plan".

In addition, "loss" does not include:

a. Benefits due or to become due under a "plan"; or

b. Benefits which would be due if such "plan" complied with all applicable law, including "loss" resulting from the payment of plaintiff attorneys' fees based upon a percentage of such benefits or payable from a common fund established to pay such benefits, except:

(1) To the extent that benefits are payable by an "individual insured" as a personal obligation, and recovery for the benefits is based upon a covered "fiduciary wrongful act"; or

(2) By reason of a change in value of the investments held by a "plan" when a "claim" is made against an insured that alleges a "loss" to such "plan", even if the amounts sought or recovered by the plaintiffs in such "claim" are described by plaintiffs as benefits or held by a court as benefits.

DEL 100 (08/13)

WW 000065

RENTKO DEC - EXHIBIT B
Page 000068

**SECTION II - DEFINITIONS** is amended by adding the following:

1. **"Administration"** means:

   a. Counseling "employees", beneficiaries or "plan" participants with respect to any "plan";

   b. Providing interpretations with respect to any "plan";

   c. Handling records in connection with any "plan"; or

   d. Enrolling, terminating, or canceling "employees" or beneficiaries under any "plan".

2. **"Consulting fees"** means fees charged by a third-party actuary, benefits consultant or accountant resulting solely from the correction of non-compliance set forth in a "voluntary compliance program". "Consulting fees" do not include any fees, costs and expenses associated with:

   a. A "plan" audit; or

   b. Identifying, finding or assessing such non-compliance.

3. **"Delinquent filer penalties"** means penalties assessed by the U.S. Department of Labor or the Internal Revenue Service ("IRS") under a Delinquent Filer Voluntary Compliance Program for inadvertent failure to file Form 5500, provided that the failure to file such Form 5500 occurred during the policy period or during the policy period of a policy issued by us of which this policy is a continuous renewal.

4. **"Employee benefit plan"** means any "plan" so defined by "ERISA".

5. **"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended (including, but not limited to, amendments relating to the Consolidated Omnibus Budget Reconciliation Act of 1985, the Health Insurance Portability and Accountability Act of 1996 as it relates to sections 102(b) and 104(b)(1) of "ERISA", the Newborns' and Mothers' Health Protection Act of 1996, the Mental Health Parity Act of 1996, the Women's Health and Cancer Rights Act of 1998, and the Pension Protection Act of 2006, as amended), or any similar foreign, state or local common or statutory law, or any rules and regulations promulgated thereunder.

6. **"Fiduciary insured"** means:

   a. The "organization";

   b. Any "plan";

   c. Any "individual insureds"; and

   d. Any other natural person or entity who was, now is, or will be acting as a "plan" administrator of any of the "plans" at your written request and consent and included by specific written endorsement to this policy.

   Outside fiduciaries and third-party administrators are not "fiduciary insureds" unless added as an additional "fiduciary insured" to this policy by specific, written endorsement.

7. **"Fiduciary wrongful act"** means:

   a. With respect to a "sponsored plan":

   (1) Any actual or alleged breach of the responsibilities, obligations or duties imposed upon fiduciaries of the "sponsored plan" by "ERISA", or by "HIPAA";

   (2) Any other matter claimed against you or any of the "individual insureds" solely because of your service or the service of any of the "individual insureds" as a fiduciary of any "sponsored plan", including any actual or alleged violation of "HIPAA"; or

   (3) Any actual or alleged act, error or omission in the "administration" of any "sponsored plan", including any actual or alleged violation of "HIPAA".

DEL 100 (08/13)

WW 000066

RENTKO DEC - EXHIBIT B
Page 000069

b. With respect to an "insured plan", any actual or alleged act, error or omission in the "administration" of such "insured plan".

8. "HIPAA" means the Health Insurance Portability and Accountability Act of 1996 and the Health Information Technology for Economic and Clinical Health Act, or any similar state or local common or statutory law, and any rules and regulations promulgated under either of these Acts.

9. "HIPAA penalties" means civil money penalties imposed upon a "fiduciary insured" for violation of Part 164 of the regulations under the Health Insurance Portability and Accountability Act of 1996, popularly known as HIPAA Privacy Regulations, and any rules or regulations promulgated thereunder.

10. "Insured plan" means any government-mandated insurance for workers' compensation, unemployment, social security or disability benefits for your "employees"

11. "Pension benefit plan" means any "plan" so defined in "ERISA".

12. "Plan" means:

   a. Any "sponsored plan"; and

   b. Any "insured plan",

   established before or after the inception of this policy.

13. "Plan termination" means the termination, suspension, merger or dissolution of any "plan".

14. "Sponsored plan" means:

   a. Any "employee benefit plan", "pension benefit plan", or "welfare benefit plan" which is operated by you for the benefit of your "employees";

   b. Any other "plan", fund or program specifically included as a "sponsored plan" by endorsement to this policy; and

   c. Any other "employee benefit plan" or program not subject to Title 1 of "ERISA" sponsored by you for the benefit of your "employees";

   provided, however, that the "sponsored plan" does not include any:

   a. "Employee" stock ownership "plan"; or

   b. Multi-employer "plan", as defined in "ERISA".

15. "Voluntary compliance loss" means fines, penalties, sanctions, voluntary correction fees, compliance fees or user fees assessed against or collected from a "fiduciary insured" for the actual or alleged inadvertent non-compliance by a "plan" with any statute, rule or regulation if participation by the insured in such "voluntary compliance program" results in your obtaining a "No Action" letter from the governmental authority; provided "voluntary compliance loss" will not include: (a) Any costs to correct the non-compliance, or any other charges, expenses, taxes or damages; or (b) Any fees, fines, penalties, sanctions or "defense costs" relating to a "plan" which, as of the earlier of inception of this policy or inception of the first policy in an uninterrupted series of policies issued by us of which this policy is a direct or indirect renewal or replacement, any "individual insured" knew to be actually or allegedly non-compliant.

16. "Voluntary compliance program" means a written agreement to correct an inadvertent "plan" defect under a voluntary compliance resolution program or similar voluntary settlement program administered by the U.S. Internal Revenue Service, the U.S. Department of Labor or other similar governmental authority, including without limitation the Employee Plans Compliance Resolution System, the Audit Closing Agreement Program, the Voluntary Compliance Resolution Program, the Walk-In Closing Agreement Program, the Administrative Policy Regarding Self-Correction, the Tax Sheltered Annuity Voluntary

DEL 100 (08/13)

WW 000067

RENTKO DEC - EXHIBIT B
Page 000070

Correction Program, the Delinquent Filer Voluntary Compliance Program, and the Voluntary Fiduciary Correction Program, provided that such agreement to correct such "plan" defect was entered into in writing by you with the U.S. Internal Revenue Service during the policy period, or during the policy period of a policy issued by us of which this policy is a continuous renewal.

17. "Voluntary fiduciary correction expense" means "defense costs", and "consulting fees" incurred in connection with correction of non-compliance set forth in a "voluntary compliance program".

"Voluntary fiduciary correction expense" does not include (a) Any other charges, expenses, taxes or damages, other than "defense costs" and "consulting fees"; or (b) Any fees, fines, penalties, sanctions or "defense costs", and "consulting fees", relating to a "plan" which, as of the earlier of inception of this policy or inception of the first policy in an uninterrupted series of policies issued by us of which this policy is a direct or indirect renewal or replacement, any "individual insured" knew to be actually or allegedly non-compliant.

18. "Welfare benefit plan" means any "employee" "welfare benefit plan" so defined in "ERISA".

SECTION III - EXCLUSIONS is amended as follows:

Exclusion 14. ERISA, is deleted in its entirety.

Exclusion 4. Pending and Prior Litigation and Exclusion 13. Labor Relations Act, are deleted in their entirety and replaced with the following:

This insurance does not apply to any "loss" or "defense costs" in connection with any "claim" made against an insured, arising out of, directly or indirectly resulting from, or in consequence of, or in any way involving:

4. Pending and Prior Litigations and Investigations

Any pending or prior civil, criminal, administrative, or investigative proceeding involving the "plan" and/or any "fiduciary insured" as of the effective date of this policy or any "fiduciary wrongful act" or any fact, circumstance or situation underlying or alleged in such proceeding; provided, that, if this policy is a renewal of a policy or policies previously issued by us and if the coverage provided by us was continuous from the effective date of the first policy to the effective date of this policy, the reference in this exclusion to effective date will mean the effective date of the first policy under which we first provided continuous coverage to you.

13. Labor Relations Act

   a. The Fair Labor Standards Act;

   b. The National Labor Relations Act;

   c. The Worker Adjustment and Retraining Act;

   d. The Occupational Safety and Health Act;

   e. The Racketeering Influence and Corrupt Organizations Act;

   f. The Federal False Claims Act;

   g. Other similar provisions of any federal, state or local or common law of any rules or regulations promulgated under any of the foregoing.

This exclusion does not apply to any actual or alleged obligation of any "fiduciary insured" pursuant to the:

(1) Consolidated Omnibus Budget Reconciliation Act of 1985, as amended; or

(2) Health Insurance Portability and Accountability Act of 1996, as amended.

DEL 100 (08/13)

WW 000068

RENTKO DEC - EXHIBIT B
Page 000071

**SECTION III - EXCLUSIONS** is amended by adding the following:

This insurance does not apply to any "loss" or "defense costs" in connection with any "claim" made against an insured, arising out of, directly or indirectly resulting from, or in consequence of, or in any way involving:

1. **Employment Law Compliance**

   The failure to comply with any statutory or common law governing workers' compensation, unemployment, social security or disability benefits or any similar law; provided, however, this exclusion does not apply to any actual or alleged obligation of any "fiduciary insured" pursuant to the:

   a. Consolidated Omnibus Budget Reconciliation Act of 1985, as amended; or

   b. Health Insurance Portability and Accountability Act of 1996, as amended.

2. **Plan Termination**

   Any "fiduciary wrongful act" committed subsequent to a "plan termination"; provided, however, that this exclusion will only apply to those "plans" which were the subjects of the "plan termination".

3. **Employment-Related Matters**

   Any employment or employment-related matters; provided, however, this exclusion does not apply to any "claim" where such employment or employment-related matters involve actual or alleged violations of "ERISA".

4. **Breach of Contract**

   Breach of any contract or agreement; except to the extent that liability would have attached to you in the absence of such contract or agreement, or where the liability was assumed in accordance with or under the trust agreement or equivalent document pursuant to which any of the "plans" were established. However, this exclusion does not apply to "defense costs" incurred.

5. **Contributions Owed**

   a. The failure to collect from you contributions owed to any of the "plans", or the failure to fund a "plan" in accordance with "ERISA", unless the failure is solely due to the negligence of any of the "fiduciary insureds"; or

   b. Any "claim" which constitutes benefits due or to become due under the terms of any "plan" if such "plan" complied with all applicable law, unless and to the extent that:

      (1) The "fiduciary insured" is a natural person and the benefits are payable by such "fiduciary insured" as a personal obligation; and

      (2) Recovery for the benefits is based upon a covered "fiduciary wrongful act".

   However, this exclusion does not apply to "defense costs" incurred.

6. **Successor Liability**

   Any act, error or omission as respects a "plan" taking place at the time when the "organization" did not sponsor the "plan" or the "fiduciary insured" was not a fiduciary of the "plan".

**SECTION IV - LIMITS OF INSURANCE** is amended by adding the following:

1. The "Voluntary Compliance Loss" Sub-Limit is the most we will pay under the Pension Trust Liability Coverage for the payment of "voluntary compliance loss", "delinquent filer penalties", and "voluntary fiduciary correction expenses" combined resulting from all "claims" due to a "fiduciary wrongful act". Such amount will be part of, and not in addition to, the Pension Trust Liability Aggregate Limit.

DEL 100 (08/13)

WW 000069

RENTKO DEC - EXHIBIT B
Page 000072

2.  The "HIPAA Penalties" Sub-Limit is the most we will pay under the Pension Trust Liability Coverage for the payment of "HIPAA penalties" resulting from all "claims" due to a "fiduciary wrongful act". Such amount will be part of, and not in addition to, the Pension Trust Liability Aggregate Limit.

3.  The Pension Trust Liability Aggregate Limit is the most we will pay under the Pension Trust Liability Coverage for all "loss", due to "fiduciary wrongful act" "claims".

**SECTION IV - LIMITS OF INSURANCE** is amended by adding the following:

Our maximum Aggregate Limit, on the Declarations as item 1. and/or 4., and the Pension Trust Liability Aggregate Limit in this endorsement for the sum of all "loss" and "defense costs" for all "claims" or "interrelated claims" made under Coverage A. and B. of the Coverage Parts and this endorsement will be $1,000,000.

DEL 100 (08/13)

WW 000070

RENTKO DEC - EXHIBIT B
Page 000073

This Endorsement Modifies Your Policy.
Please Read It Carefully.

## CRISIS MANAGEMENT ENDORSEMENT

This endorsement modifies insurance provided under the following:

DIRECTORS, OFFICERS, INSURED ENTITY AND EMPLOYMENT PRACTICES INSURANCE COVERAGE PART

The Directors and Officers Insurance Coverage Part Declarations is amended with the addition of the following:

CRISIS MANAGEMENT FUND LIMIT

Crisis Management Fund Limit $ 25,000.

SECTION I - INSURING AGREEMENTS is amended as follows:

Section 5, Coverage Extensions, is amended by adding the following:

d. Crisis Management Coverage

(1) We will pay on your behalf "crisis management expenses" which you become legally obligated to pay by reason of a "crisis event" first occurring during the policy period.

(2) There will be no Retention applicable to "crisis management expenses", and we will pay such "crisis management expenses" from the first dollar subject to all other terms and conditions of this policy.

(3) An actual or anticipated "crisis event" must be reported to us as soon as practicable, but in no event later than thirty (30) days after you first incur "crisis management expenses" for which coverage will be requested under this policy.

(4) The Crisis Management Fund Limit is our maximum liability for all "crisis management expenses" arising from any and all "crisis events" occurring during the policy period. This limit will be our maximum liability under this policy regardless of the number of "crisis events" reported during the policy period. Our obligation to pay "crisis management expenses" terminates upon the exhaustion of the Crisis Management Fund Limit.

(5) If the policy's aggregate limits are exhausted then crisis management coverage ends.

(6) The Crisis Management Fund Limit will be in addition to the Aggregate Limit of Insurance stated in Item 1. of the Coverage Part Declarations.

SECTION II - DEFINITIONS is amended as follows:

Definition 11; "Loss", is amended by adding the following:

In addition, "loss" does not include "crisis management expenses".

The following definitions are added:

"Crisis event" means one of the following, except where coverage is otherwise excluded under SECTION III - EXCLUSIONS, Subsection 5. Prior Knowledge and Subsection 6. Pollution of the policy:

a. The incapacity; death; or state or federal criminal indictment of an "individual insured";

WW 000071

RENTKO DEC - EXHIBIT B
Page 000074

b. The cancellation, withdrawal or revocation of $500,000 or more in funding, donation(s), grant(s) or bequest(s) by a non-government entity or person to you;

c. The disclosure by you of (1) your intention to file or your actual filing for protection under federal bankruptcy laws, or (2) a third party's intention to file or its actual filing of an involuntary bankruptcy petition under federal bankruptcy laws;

d. The disclosure by you of the threatened or actual commencement by a third party of an action, audit or investigation alleging a "wrongful employment act" by you which has caused or is reasonably likely to cause a "material effect"; or

e. Any other material event which, in your good faith opinion, has caused or is reasonably likely to result in a "material effect", but only if such material event is scheduled for coverage by written endorsement to this policy.

"Crisis management expenses" means the following expenses incurred by you during a period beginning ninety (90) days prior to and in reasonable anticipation of a "crisis event" and ending ninety (90) days after an actual or reasonably anticipated "crisis event", irrespective of whether a "claim" is actually made with respect to the subject "crisis event"; provided, however, that we must have been notified of the "crisis management expenses" within thirty (30) days of the date you first incur the subject "crisis management expenses":

a. The reasonable and necessary expenses directly resulting from a "crisis event" which you incur for "crisis management services" provided to you by a "crisis management firm"; and

b. The reasonable and necessary expenses directly resulting from a "crisis event" which you incur for:

(1) Advertising, printing, or the mailing of matter relevant to the "crisis event"; and

(2) Out of pocket travel expenses incurred by or on behalf of you or the "crisis management firm";

provided, however, "crisis management expenses" does not include those amounts which otherwise would constitute compensation, benefits, fees, overhead, charges or expenses of an insured.

"Crisis management firm" means a marketing firm, public relations firm, law firm, or other professional services entity retained by us or by you with our prior written consent, to perform "crisis management services" arising from a "crisis event".

"Crisis management services" means the professional services provided by a "crisis management firm" in counseling or assisting you in reducing or minimizing the potential harm to you caused by the public disclosure of a "crisis event".

"Material effect" means the publication of unfavorable information regarding you which can reasonably be considered to materially reduce public confidence in your competence, integrity or viability to conduct business. Such publication must occur in a report about an insured appearing in a daily newspaper of general circulation; or a radio or television news program.

SECTION III - EXCLUSIONS is amended as follows:

SECTION III - EXCLUSIONS does not apply to "crisis management expenses".

DEL102 (08/13)

WW 000072

RENTKO DEC - EXHIBIT B
Page 000075

☒ Western World Insurance Co.          ☐ Tudor Insurance Co.          ☐ Stratford Insurance Co.

## GENERAL CHANGE ENDORSEMENT

**Attaching to and forming a part of:**

Policy #: BRL8000034 _____          Effective Date of Policy: __02/17/2014__

Endorsement #: 1 _____          Effective Date of Endorsement: __03/17/2015__

Insured: Professional Collection Consultants _____

Additional Premium  $ 1,946.00 _____          Return Premium  $ _____

**The following change(s) is/are made in this policy:**

The expiration date has been changed from **2/17/2015** to **4/18/2015**.

The total addl amount is: **$1,946.00**.

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED

Dated: __02/26/2015__

Agent No. 16104 _____

Authorized Agent

COMPANY

WW453 (10/11)

WW 000073

RENTKO DEC - EXHIBIT B
Page 000076