1  LAW OFFICES OF CLARK GAREN
2  CLARK GAREN (Cal. Bar No. 50564)
   RACHEL ZWERNEMANN (Cal. Bar No. 286515)
   6700 South Centinela, Third Floor
3  Culver City, CA  90230
   Telephone: (310) 391-0800
4  Facsimile: (310) 636-4771
   Email: clarkgaren@msn.com
5  Email: rzwernemann@pcc-crs.com

6  LAW OFFICE OF DAVID W. WIECHERT
   DAVID WIECHERT (Cal. Bar No. 94607)
7  JESSICA C. MUNK (Cal. Bar No. 238832)
   115 Avenida Miramar
8  San Clemente, California  92672
   Telephone:(949) 361-2822
9  Facsimile: (949) 496-6753
   Email: dwiechert@aol.com
10 Email: jessica@davidwiechertlaw.com

11 Attorneys for Defendant,
   Professional Collection Consultants
12

13            IN THE UNITED STATES DISTRICT COURT

14         FOR THE CENTRAL DISTRICT OF CALIFORNIA

15                     WESTERN DIVISION

16

17 | WESTERN WORLD INSURANCE COMPANY, | Case No. 2:15-cv-02342 MWF (VBKx) |
18 | | DECLARATION OF CLARK GAREN IN OPPOSITION TO WESTERN WORLD INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT |
   | Plaintiff, | |
19 | v. | |
20 | PROFESSIONAL COLLECTION CONSULTANTS, | |
21 | | Date:  March 21, 2016 |
22 | Defendant. | Time: 10:00 a.m. |
   | | Ctrm: 1600 |
   | | Judge: Hon. Michael W. Fitzgerald |
23 | | |
24 | | Trial Date: November 15, 2016 |
   | | Complaint Filed: March 30, 2015 |
25 | | Discovery Cut-Off: July 8, 2016 |

26

27

28
                                    -1-

## DECLARATION OF CLARK GAREN

I, Clark Garen, declare as follows:

1. If duly called as a witness and sworn to give testimony herein, my testimony would be as hereinafter stated.

2. All of the facts stated herein are within my own, personal knowledge.

3. I have been practicing law in California since January 5, 1972. I am admitted to practice law in California and in Texas.  I am also admitted to practice law before the United States Supreme Court; the United States Court of Appeals for the Ninth Circuit; the United States District Courts for the Central, Southern, Northern, and Eastern Districts of California, the Southern and Northern Districts of Texas, and the District of Arizona; and the United States Tax Court.  I am the Vice-President and General Counsel of Defendant Professional Collection Consultants ("PCC"), and have served as an attorney to PCC since 1975.

4. A true and correct copy of the Directors & Officers Liability, Fiduciary Liability, and Employment Practices Liability insurance policy, No. 425525639, with a $1,000,000 limit, issued to PCC by Continental Casualty Company for the period of February 17, 2013 and February 17, 2014, is attached hereto as Exhibit "A."

5. Gregory Hudson ("Hudson") was hired as a Collection Representative by PCC on February 3, 2002. His employment was terminated on March 19, 2014.

6. PCC did not know that Hudson reported what he believed to be illegal conduct to the California Employment Department ("EDD") in 2007 until PCC was given a copy of his proposed complaint and a written statement on January 13, 2015 at a mediation session attempting to resolve Hudson's claims. According to Hudson's written statement presented at the mediation, the EDD investigated Hudson's claim and dismissed it when they could find no evidence of wrongdoing.

7. Beblen Pole ("Pole") was hired as a Collection Representative by PCC on March 1, 2013. Her employment was terminated on February 18, 2014. She had

1  initially been hired by The Best Service Company on March 11, 2008, and came to
2  work for PCC when it acquired The Best Service Company.

3      8. Lisa McCann ("McCann") was hired as a H.R and Accounting Director by
4  PCC on February 28, 2013. This was a key position because PCC is a very small
5  company.  She went out on disability leave in February, 2014. When she had
6  exhausted all of her leave and was unable to return to work, she was terminated on
7  November 20, 2014.

8      9. Pursuant to a search warrant issued August 23, 2013 the Federal Bureau of
9  Investigation ("FBI") conducted a search of the PCC offices and seized evidentiary
10 material related to potential Title 18 violations including conspiracy, wire fraud and
11 theft or bribery concerning programs receiving federal funds. I clarify that while
12 PCC's Answer to Western World's Complaint, paragraph 82.D. can be read that
13 Hudson and other employees were interviewed during this search, they were not.

14     10. After the execution of the search warrant, I personally arranged for
15 attorney James Riddet to be retained on August 29, 2013 to represent Todd Shields
16 for the sum of $15,000.00, which was to cover all services prior to indictment. This
17 retainer was paid by PCC.

18     11. On August 30, 2013, I retained the law firm of Corrigan, Welbourn &
19 Stokke to represent PCC for the sum of $15,000.00 in connection with the August
20 23, 2013 search. This retainer was paid by PCC.

21     12. On August 30, 2013, the Law Offices of William Kopeny was retained to
22 represent Michael Flowers in connection with the August 23, 2013 search, for the
23 sum of $15,000.00.  This retainer was paid by PCC.

24     13. On September 4, 2013, the firm of Bienert, Miller and Katzman was
25 retained to represent Donald Hopp in connection with the August 23, 2013 search,
26 for the sum of $15,000.00. This retainer was paid by PCC.

27
28

14. On September 20, 2013, the sum of $5,000.00 was paid to James Riddet to cover the cost of investigation fees. This was paid by PCC.

15. On January 9, 2014, the sum of $4,000.00 was paid to attorney Robert Van Hoy to represent PCC employees who had been subpoenaed to testify before the grand jury. This was paid by PCC.

16. PCC paid a total of $69,000.00 in attorney fees and investigation expenses related to the FBI search warrant and subpoenas. I did not submit a claim for these expenditures or have PCC submit a claim under PPC's Continental Casualty Company Directors & Officers Liability, Fiduciary Liability, and Employment Practices Liability insurance policy, No. 425525639 for the policy period of February 17, 2013 to February 17, 2014 because I did not know that this policy extended coverage for these expenses or any expenses related to a criminal investigation. I assumed that such expenses were not insurable pursuant to California public policy. Had I known that coverage was afforded for these expenses, I would have certainly had PCC submit a claim therefor.

17. On or about September 11, 2013, I learned that the Assistant United States Attorney orally advised Todd Shields' counsel that Shields was a target of a federal investigation and faced imminent indictment.  Shields' counsel responded by providing exculpatory information to the federal prosecutor.

18. In October, 2013 the United States Attorney's Office questioned three PCC employees before a grand jury.

19. In November, a grand jury subpoena was issued to two PCC employees, Michael Jackson, aka Ron Jacobs, and Gary Condon, aka Gary Gamble. Attorney Robert Van Hoy was retained by PCC to represent these employees in the grand jury investigation. The appearance dates were continued several times and eventually cancelled.

20. The FBI search warrant identified the crimes of bribery, conspiracy, and wire fraud. As an officer of PCC, I did not believe that the corporation or any of its employees had committed the crimes of bribery, conspiracy, or wire fraud. In addition, I did not believe that any of the documents obtained by the search warrants or subpoenas or any of the testimony provided by any of the witnesses provided sufficient evidence to sustain an indictment for bribery, conspiracy, or wire fraud. Since the indictment, which was supposedly imminent, had never been filed and since the investigation appeared to have been halted based on the exculpatory information provided to the Assistant United States Attorney and the evidence and testimony obtained, as well as the cancellation of the grand jury subpoenas, by February 7, 2014, I had concluded that the FBI had decided to close its investigation in to PCC.

21. It was only after PPC completed the Application, and the Policy was issued, did the federal investigation commence again when two grand jury subpoenas were issued in May 2014.

22. As stated in Paragraph 33 of the PCC Answer to the Western World Complaint, on or about June 17, 2013, I, in my capacity as Vice-President and General Counsel of PCC, personally counseled Hudson about his job performance. He complained that his supervisor was not fairly distributing accounts. This charge was investigated; the supervisor was discharged; and the accounts were re-distributed. A few days later, I personally questioned Hudson and he expressed satisfaction with the resolution. During the June 17, 2013 meeting, Hudson expressed an opinion that PCC was doing something illegal, but when I asked to specifically identify the practices that he through were illegal or questionable, he shrugged his shoulders and refused to provide any further response or details to me. Therefore, I assumed that Professional Collection Consultants was not doing anything that was illegal or unethical. I have now listened to three complete days of depositions with

Hudson, and during those three days of depositions has still not articulated any actions by PCC that I believe are either illegal or unethical.

23. A true and correct copy of the PCC Answer to the Western World Complaint is attached hereto as Exhibit "B."

24. On or about March 19, 2014, I made the decision to terminate the employment of Hudson. Trusted employees of PCC had reported to myself and Todd Shields that Hudson had used the company ACH account to withdraw $100.00 from an the trust account of an attorney of a debtor without authorization. Trusted employees of PCC further reported to Todd Shields and me that Hudson had refused to cooperate in and in fact had obstructed their attempts to identify the transaction that resulted in the unauthorized withdrawal. Trusted employees of PCC reported to me and Todd Shields that they believed the actions of Hudson were intentional. Because of the potential damage an employee of PCC could do to the company by intentionally misusing its ACH account privileges to make unauthorized withdrawals from customer bank accounts, I made the decision to terminate Hudson.

25. Pole was terminated on February 18, 2014. On the date that she was terminated, no one in the management of Professional Collection Consultants had any knowledge or information that she was a whistle blower or had provided any assistance whatsoever to any investigation, criminal or otherwise. Nor did PCC have any knowledge that Pole ever complained of dishonesty by other PCC employees or cited the FBI raid as evidence of PCC's lack of ethics.  Pole was an excellent collector, but she had printed out about 50 collection notices that were illegal notices because a printer error put the disclosures required by Federal and California law on the back of the form instead of on the front of the form where they are required to be. A supervisor pulled the illegal forms from the mailbox and explained why the forms were illegal and asked her to re-issue them. The next work day, the supervisor found the same illegal forms in the mailbox again. He again removed the forms from the

mailbox and asked Ms. Pole why she put those illegal forms in the mailbox again. Ms. Pole became very angry, very threatening, and was completely out of control yelling and screaming at the supervisor. As a result of the commotion, the collection manager came to the scene and tried to quiet Ms. Pole. Her efforts were completely unsuccessful. Ms. Pole continued to make a scene, disrupted the entire work floor and work force, and left the company with no choice but to terminate her. Since collectors as skilled as Ms. Pole are very difficult to find, the company really did not want to terminate her, but her behavior that day left management with no choice.

26. McCann became a PCC employee through the acquisition of The Best Service Company on February 28, 2013. She was employed in the capacity of H.R. director and accounting director. She was the only employee who was responsible for accounting. Because PCC has fewer than 50 employees, the H.R. and accounting function was a key position and not easy to replace. McCann went out on disability leave in February, 2014. She had a medical condition that truly prevented her from working and doing her job, and it was the type of ailment that has no readily effective treatment. When she went on disability leave, the management of PCC had no knowledge that she was a whistle blower or that she had communicated in any way with any investigating agency. PCC continued to allow Ms. McCann to remain on disability leave and paid her health insurance premiums even after she had exceeded the period for which leave was allowed or health insurance premiums had to be paid. In September, 2014 management realized that the company could not continue to function without hiring someone to perform the duties formerly performed by McCann, so PCC retained outside counsel who formulated letters that were sent to McCann inquiring about her disability status. When McCann was unable to return to work in November, 2014 as she had previously stated she would be able to return to work, her employment was terminated because a replacement had to be

1  hired to perform her accounting functions to prepare year end reports and income tax
2  returns.

3      27. PCC did not discover that McCann had communicated with the FBI until
4  McCann appeared at the unemployment hearing Hudson in May 2014 to testify on
5  his behalf. At a break from the hearing McCann told Todd Shields and myself that
6  she had told the FBI about all of the illegal activities of PCC. However, she never
7  identified specifically what those activities were.

8      28. PCC lacked the knowledge that Hudson, Pole and McCann were
9  "whistleblowers" until after they had been terminated and filed claims against PCC.
10  Furthermore all three employees were fired for cause for matters wholly separate to
11  any cooperation they may have provide to the government in its investigation. As the
12  ultimate decision maker for each of their terminations, I can state that their
13  terminations were in no way related to the federal investigation, a view which I have
14  repeatedly expressed to Western World's counsel.

15      29. On July 7, 2014, Hudson served a demand for mediation under his
16  employment contract with PCC. Western World agreed to defend this claim under a
17  reservation of rights letter dated August 7, 2014, a true and correct copy of which is
18  attached hereto as Exhibit "C."

19      30. PCC provided Western World with a copy of Hudson's EDD appeal
20  hearing, which discussed the federal investigation, on July 9, 2014. Western World
21  waited seven months, after PCC had accepted insurance-assigned counsel and paid a
22  $50,000 retainage, until January 9, 2015 to notify PCC that it would not honor its
23  coverage in a supplemental reservation of rights letter, a true and correct of which is
24  attached hereto as Exhibit "D."

25      31. As explained in paragraphs 87, 88 of PCC's Answer to the Western World
26  Complaint, this unreasonable delay prejudiced PCC in numerous ways, most
27  significantly in that Hudson refused several offers to settle because of the incorrect

28

belief that PCC had deep pockets because of its Western World insurance coverage, and insurance assigned counsel's mishandling of the case and inflammatory settlement offers.

32. On January 12, 2015 I responded promptly to Western World's denial of coverage by letter, a true and correct copy of which is attached hereto as Exhibit "E."

33. Western world responded with a further denial advising they would be seeking declaratory action as to their obligations under the Policy, in a letter dated January 28, 2015, a true and correct copy of which is attached hereto as Exhibit "F."

34. On May 17, 2015 I sent a letter to Western World's counsel voicing my concerns with the insurance-appointed defense, including the unsatisfactory mediator that insurance-appointed counsel had vouched for, and the continued issue that Hudson would not accept reasonable settlement offers because Hudson continued to believe that PCC had insurance as long as insurance-appointed counsel was representing PCC. A true and correct copy of this letter is attached hereto as Exhibit "G."

35. On May 19, 2015 I sent a letter to Western World's counsel, noting that even the insurance-appointed counsel supported the substitution. A true and correct copy of this letter is attached hereto as Exhibit "H."

36. Western World's counsel responded on June 3, 2015 disregarding my concerns and denying my request to be substituted in as counsel for PCC in order to mitigate costs for all involved. A true and correct copy of this letter is attached hereto as Exhibit "I."

37. Intentionally Left Blank.

38. I advised Western World's counsel in a June 9, 2015 letter that such denial constituted bad faith on behalf of Western World, a true and correct copy of which is attached hereto as Exhibit "J."

39. Mediation is once against scheduled in the Hudson matter on March 5, 2016 and I fear that Western World's continued insistence that insurance-appointed counsel attend will diminish the likelihood of Hudson accepting a reasonable settlement.

40. If the CNA Application asked whether or not PCC was aware of or under any federal investigation, both myself and Todd Shields would have truthfully disclosed that it was.

41. As an attorney and a business owner, I am relatively familiar with insurance and insurance policies. One of the basic fundamental insurance rules that I am aware of is that in California it is against public policy to obtain insurance coverage for indemnity for criminal or willful actions. In my 44 years as an attorney, I have looked at and examined many insurance policies, but I have never looked at an insurance policy that offered any coverage for criminal activities. Frankly, I never knew such a policy existed. I never reviewed, or advised Todd Shields to review the Continental Policy after commencement of the federal criminal investigation, as I believed it did not cover criminal matters.

42.  Neither myself nor Todd Shields were given any definition as to what constituted a "claim" as used in the CNA application. When PCC answered the CNA Application page 3 question "no" on February 7, 2014, I did know of any facts or have any basis to believe that Hudson, Pole or McCann had a claim for wrongful termination, as all were still employed at PCC.  Also I did not notice that this question only applied if PCC was requesting increased policy limits, which it was not.

43. PCC has exhausted its $50,000.00 retainage on the Hudson case and has a $50,000 retainage on each of the Pole and McCann cases, which has not yet been exhausted.

44. It was not until the FBI Search Warrant was issued on August 23, 2013 that PCC learned that Hudson stated to other PCC personnel that PCC, including fellow

1   employee Mike Flowers, illegally obtained and made use of private financial

2   information of debtors and believed that PCC would be forced to close.

3      45. When I was deposed by Western World's counsel I was under the erroneous

4   belief that the statute of limitations had expired for the Pole and McCann claims and

5   thus conditionally waived the claims based on such belief.

6      46. As I testified to in my deposition by Western World's counsel, PCC is sued

7   one to two times per year for relatively minor Fair Debt Collection Practices Act

8   violations, which I do not believe constitutes "regularly," and which is not unusual for

9   a debt collection company.

10      I declare under penalty of perjury under the laws of the United States that the

11   foregoing is true and correct.

12      Executed on February 27, 2016 at North Palm Springs, California.

13

14

15                    CLARK GAREN

16

17

18

19

20

21

22

23

24

25

26

27

28