1             UNITED STATES DISTRICT COURT

2       CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3     HONORABLE MICHAEL W. FITZGERALD, U.S. DISTRICT JUDGE

4

5  WESTERN WORLD INSURANCE COMPANY,     )
                                   )

6               Plaintiff,     )
                                   )

7     vs.                    )  Case No.
                                   )  15-CV-02342-MWF

8  PROFESSIONAL COLLECTION CONSULTANTS,   )
                                   )

9               Defendant.     )
  _____)

10

11

12          REPORTER'S TRANSCRIPT OF PROCEEDINGS

13            MONDAY, MARCH 21, 2016
                10:15 A.M.

14           LOS ANGELES, CALIFORNIA

15

16

17

18

19

20

21   _____

22      NAREN JANSEN, CSR NO. 3827, RMR, CRR
           FEDERAL OFFICIAL COURT REPORTER

23      312 NORTH SPRING STREET, ROOM 412
       LOS ANGELES, CALIFORNIA  90012

24             (213) 894-2618

25

```
 1                    APPEARANCES OF COUNSEL:

 2

 3   FOR THE PLAINTIFFS:

 4       SELVIN, WRAITH, HALMAN, LLP
         BY:  JAMES L. WRAITH
 5            Attorney at Law
         505 14th Street, Suite 1200
 6       Oakland, California 94612
         (510) 874-18116
 7

 8   FOR THE DEFENDANTS:

 9       LAW OFFICE OF DAVID W. WIECHERT
         BY:  DAVID W. WIECHERT
10            Attorney at Law
         115 Avenida Miramar
11       San Clemente, California 92672
         (949) 361-2822
12

13   ALSO PRESENT:  CLARK GAREN, Attorney at Law

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1                LOS ANGELES, CALIFORNIA; MONDAY, MARCH 21, 2016

 2                           10:15 A.M.

 3                           --oOo--

 4        THE COURTROOM DEPUTY:  Calling item number 3, case number

 5   CV-15-2342-MWF, Western World Insurance Company versus

 6   Professional Collection Consultants.

 7        Counsel, please rise and state your appearance for the

 8   record.

 9        MR. WRAITH:  Good morning, Your Honor.  Jim Wraith on

10   behalf of plaintiff Western World Insurance Company.

11        THE COURT:  Good morning.

12        MR. GAREN:  Clark Garen appearing for the defendant

13   Professional Collection Consultants.

14        MR. WEICHERT:  Good morning, Your Honor.  David Weichert

15   on behalf Professional Collection Consultants, who is not only

16   the defendant but also the cross-claimant.

17        THE COURT:  Good morning, Your Honor, Counsel,

18   particularly Mr. Weichert.  Mr. Weichert and I have known each

19   other for many, many years because of our practices as white

20   collar criminal defense attorneys.  I don't see any -- it's not

21   such a relationship as would require recusal, but I do want to

22   disclose it.  And so, once again, good morning, Mr. Weichert.

23        I'll hear from the defense.

24        This was a difficult -- despite the tentative, I want to

25   say this was a difficult decision for me.  So I'll be
```

1    interested in hearing why the tentative is wrong.

2         You know, ultimately, I did feel the need to kind of go to

3    the jury instructions and just ask myself, you know, what is it

4    that the jury would be asked to do.  It's just such an unusual

5    circumstances where there is this nonfrivolous argument that

6    the precise answer is surplusage.

7         But we're dealing with an issue here where we're talking

8    about interpretation of an insurance policy.  And the written

9    document, generally, generally matters for the court and not a

10   jury as sort of a background.  So I did feel comfortable here

11   just asking myself, like, would a jury in this courtroom be

12   wasting its time.

13        That being said, I generally tell my law clerks that

14   there's no -- they say that they are agonizing on what

15   recommendation to make on summary judgment.  I said, well, you

16   should never agonize on summary judgment because if you're

17   agonizing it means it should be denied and it should go to the

18   jury.  And I guess this is one of the rare exceptions I'm

19   making to that practice.

20        But it's just, given that there is California law which

21   says that the underwriter is entitled to rely on the entirety

22   of the application and these statements were there, it's just

23   very difficult to see what it is that a jury would be deciding

24   here.

25        But with that, let me hear from the defense.

1        MR. WEICHERT:  Good morning, Your Honor.  And given the

2   nature of the relationship, I may be recommending to clients

3   next time to hire a lawyer who doesn't have a long-standing

4   relationship with the court.

5        Let me start with a few areas that I don't think there can

6   be any disagreement on.  And I believe the court is right.

7   That this is an unusual case to the extent that the court is

8   finding that there are reasons why this case should go to a

9   jury and yet it is granting summary judgment.

10       Because the general presumption is that if there is it any

11  basis for a dispute over a material fact or a material issue,

12  whether it's an issue of fact or law, but in this case it's an

13  issue of fact, then the matter should go to the jury.

14       And with regard to the non-movement, the standard is that

15  you construe every inference in favor of the nonmoving party.

16  And I don't think, reading the tentative, that the court has

17  done that here.

18       In fact, some of the portions of the tentative the court

19  cites that are factors in our favor, the court kind of goes on

20  and says, but that doesn't matter.

21       But that's not really the standard here.

22       The standard is, is there no material issue.  We believe

23  that there's a substantial material issue and that material

24  issue deals with materiality and whether or not the information

25  that was known at the time that the application was proffered

1   to the insurance company was material to the insurance

2   carrier's decision to issue the policy.

3        The court does cite, and I cited this in my notes,

4   underlined, bolded, *Imperial Casualty versus Sogomonian*, which

5   says that the trier of fact is not required to believe the

6   postmortem testimony of an insurer's agents that insurance

7   would have been refused had the facts been disclosed.

8        That's right.  The jury needs to listen to the underwriter

9   to explain --

10        THE COURT:  Mr. Weichert, isn't that precisely the issue

11   where -- I mean, are you really saying that a rational jury

12   would conclude that if the true state of affairs had been

13   disclosed that the policy would have been extended?

14        I mean, first of all, I don't think there's any record of

15   that, there's any evidence in support of that.

16        I mean, I think it's, rather, is how -- what effect does

17   it have that this answer is arguably surplusage or it was in

18   response to an ambiguous question?

19        I think those are the stronger arguments for you.

20        Are you really saying that any jury would have said that

21   they would have extended this if the true state of facts at

22   that time, not what happened afterwards, which is under seal

23   and I'm not going the to reference it, I don't need to rely on

24   it -- but just what was true at that time had been known that

25   they would have extended policy?

1      MR. WEICHERT:  It doesn't have to be every jury.  It could

2  just be one jury.  And, in fact, it could be one juror on that

3  jury, given the standard for summary judgment.

4      THE COURT:  Well, I think, as to that argument, I would

5  have to say a stupid, irrational juror.

6      MR. WEICHERT:  Well, then, let me say with a straight face

7  to the invisible jurors in the box what the argument would be.

8  That is, that you'd have to be out of your mind to retaliate

9  against witnesses that you know are participating in

10  cooperating with the United States Government in a Federal

11  criminal investigation.

12      And I would put up on a big board 1512 of Title 18 that

13  says that it is felony conduct to harass or intimidate

14  individuals who are cooperating with the government.

15      And so, to the extent that there was a criminal

16  investigation, I will argue to that jury that actually detracts

17  from the notion that there's going to be this kind of claim.

18      There's actually an inverse relationship between the

19  likelihood of the claim and the existence of the Federal grand

20  jury investigation.

21      And if you say, well, the Federal grand jury investigation

22  is just on its face material, under no circumstances can we say

23  it's not material, even though that question wasn't asked.

24      And it's -- to me was mind-boggling that plaintiffs cited

25  *Zurich*.  I mean, *Zurich* should be our case, because that's the

1    question they should ask.

2        If they really care about whether or not a company or its

3    officers are under investigation, ask the question.  Ask what

4    they did in *Zurich*.

5        It's like the healthcare cases they cite.

6        You ask the specific question:  Does the individual

7    seeking health insurance, have they seen a doctor?  Do they

8    have conditions?  When was the last time?

9        Some of the cases involve ten separate questions going to

10   the conditions of the patient.

11       There wasn't one question here that was directed to

12   whether or not this company was under investigation.

13       So if you say to me, can I make the argument to the jury

14   that this is irrelevant to the determination of whether or not

15   this policy should be issued?  Absolutely.

16       Can you say to me, do I have a right to do discovery to

17   get to whether or not I can ask the underwriter, whether it's

18   the specific underwriter or the supervisor or whoever the

19   movant puts on the stand, why this would be material?

20       Because if you look at Rentko's declaration, there is no

21   basis for why this is material.

22       If you look at the case, the *St. Paul* case that they cite,

23   the senior underwriter they put on the stand said it's material

24   because it affects our risk.  And the reason why you should

25   disclose an answer to the question as to whether or not the

1    company was involved with a joint venture is because we have

2    made the determination this affects our risk.  They may have

3    done studies on that.  They may have some basis for that.

4        If you look at Rentko's declaration, there's absolutely no

5    basis for that.

6        So now you're saying, first of all, if the law is that

7    they don't have to accept the postmortem testimony, do we

8    accept postmortem testimony when there isn't even a basis for

9    it?

10       And then the court at the end of the tentative says, well,

11   we sat on our rights because we haven't done any discovery.

12       What are discovery deadlines for?  They are to advise the

13   party when they need to complete their discovery.

14       All of the cases that are cited in the papers by the

15   movants involve applications for more time, situations where

16   the court has set deadlines and the moving party said -- I'm

17   sorry, the nonmoving party has said, we want to change those

18   deadlines.

19       That isn't what's going on here at all.  What's going on

20   here at all is the court gave us a calendar.  We relied on that

21   calendar.

22       We have three and a half more months to do discovery.  I

23   have issued discovery that's going to get questions answered as

24   to what the meaning of this question is in the policy and what

25   the meaning is in the application?  Why is it significant to

1    the insurance carrier?  Why was it significant to the

2    underwriter?  Why it's significant to the boss of the

3    underwriter.

4        We don't have any of that.  We don't have the underwriting

5    file.  That was never produced to us under Rule 26.  That

6    should have been produced to us because it's pertinent, and it

7    never was.

8        They produced the policy.  Yeah, we have that.  They

9    produced it application.  But we didn't get anything more than

10   that other than our correspondence back and forth.  We don't

11   know what was happening internally.

12       So if you say, Mr. Weichert, your client should have acted

13   sooner.  Why?  The court gave us until July to complete

14   discovery.  It is now March.  We still have months to complete

15   the discovery.

16       And so, to the extent that the court cites to those cases

17   that say, you should have done discovery, those aren't cases

18   which discovery should have been done before the time the court

19   had originally set.

20       Anyway.

21       They have cited no cases where a court has granted summary

22   judgment on the basis of materiality where a question has not

23   been clearly, falsely answered.  Where a specific inquiry was

24   made and a denial was made and it was shown that that denial

25   was palpably false.

1           That isn't this case, Your Honor.

2           And, as the court notes in its papers, it's intriguing

3     that the question that they're relying on in the application

4     didn't even apply here.  It didn't apply here because there

5     wasn't -- there wasn't a request to increase the limits of the

6     policy.

7           And the other interesting thing about this, and it goes

8     back to the question the court asked, which is, how can you

9     argue to the jury that this isn't really relevant?

10          The other argument I'm going to make is this:  If

11    Mr. Garen and his representatives of our client, PCC, were

12    actually thinking, gosh, you know, there's a criminal

13    investigation going on.  And we're so upset about it and we're

14    so enraged that we're going to do something completely

15    irrational and put ourselves in further criminal jeopardy by

16    retaliating against witnesses in that investigation.  And we're

17    going to terminate them.  And so they have this devilish little

18    scheme in mind.

19          Well, if they're acting rationally at all, they're going

20    to do the termination before this policy ever goes into effect.

21          Because under the prior CNA policy, which has the same

22    million-dollar limits, if they do the termination in late

23    January of 2014 rather than in February of 2014, there is no

24    question.  Because that CNA policy was issued at a time when

25    the investigation didn't even exist.

1      So if they're really thinking about does this question

2   pertain to the criminal investigation, and that's in their

3   thought process in earlier 2014, we wouldn't be here.  And the

4   reason we wouldn't be here is because they would have

5   terminated those individuals in January of 2014 and CNA

6   wouldn't be on the hook.

7      But they weren't thinking about that.  And they couldn't

8   have been thinking about that.  And if they were really

9   thinking rationally, they never would have terminated those

10  individuals on the basis of the Federal investigation.

11     But when these individuals filed suit -- and the court

12  probably has some familiarity with this -- if the individuals

13  know that there's a Federal investigation, even if there is no

14  merit to the notion that they're being retaliated against, even

15  though if there's no merit that there's some whistleblower

16  aspect to this, they're going to claim it.

17     I mean, why not?  They're going to say, we were terminated

18  because of this investigation.  And that's what the litigation

19  is all about.

20     We have never conceded that that was our motivation.

21     And in terms of some of the claims that have been made

22  against us, they not only relate to whistleblower claims, but

23  they relate to employment discrimination claims.  Claims that

24  have nothing to do with the grand jury investigation.

25     What the court is being asked to do here today is to do

1   something that no court has done before, and that is to find

2   summary judgment against an insured on the basis of a question

3   wasn't asked and thus it's on a situation where the senior

4   underwriter has given no explanation for his decision as to why

5   it was material or pertinent.

6        And that we haven't had a chance to complete discovery

7   under a schedule that this court which would normally allow us

8   to complete discovery by July of 2016.

9        THE COURT:  Thank you, Mr. Weichert.

10       MR. WRAITH:  Good morning, Your Honor.  Counsel.

11       I'll just confine my responses to the argument that

12   Counsel made.  Plaintiff is otherwise willing to submit on the

13   basis of the tentative ruling.  I don't intend to argue all of

14   my papers that were supportive of the tentative ruling.  I

15   would respond to additional questions posed by the court,

16   however.  Absent those questions, I will confine  my remarks --

17       THE COURT:  Just -- I -- if I change my mind, I don't want

18   your client to be mad at you.  You know, as I -- I prefaced

19   this by saying this is a much more tentative tentative than I

20   usually give.  At some point I just find it useful to counsel,

21   to myself, to just come down one side or the other.

22       But, I mean, there are some real issues here, including, I

23   think, the issue of the ambiguity of the question combined.

24       But, even more than that, I mean, it is even more than the

25   fact of was this in some sense surplusage?  Because it really

 1   wasn't -- you know, they volunteered to answer this question.

 2   I don't think there's any real issue that they could have

 3   presented something which would not have been a

 4   misrepresentation if they had chosen not to answer this

 5   question, and they weren't required by the application to

 6   answer this question.

 7        MR. WRAITH:  Thank you for your remarks, Counsel -- I

 8   mean, Your Honor.  I'll address that at well.  Appreciate that.

 9        Counsel stood up and indicated that this is not

10   appropriate for motion for summary judgment because there was

11   disputed facts and law which the jury would respond to.

12        There's no disputed law, and the jury doesn't make issues

13   of law.  That's reserved for the court.  The only -- Counsel

14   was wrong in making that suggestion.

15        The only issue for the court is whether there are material

16   disputed facts.  And there are no material disputed facts.

17   There really aren't.  At all.

18        It's amazing, the degree of agreement on both sides with

19   regard to all of the material facts.  What we're arguing about

20   here is not whether or not there are disputed facts, we're

21   arguing about our interpretation under the law of how those

22   those undisputed facts would lead this court to a conclusion.

23        The issue with regard to surplusage seems to have become

24   the real issue, or at least one of the important issues before

25   this court.

1    They had a policy with CNA.  They elected not to stay with

2    CNA.  I don't know the reasons why.  They took the CNA renewal

3    application, which is why there was this indication in there

4    that if you're not seeking to increase the limits, you don't

5    need to answer this one question.

6    And they submitted that to other brokers to get placement

7    with other insurance carriers, including my client, Western

8    World.

9    It's not surplusage when you answer it.  It's not

10   surplusage when you answer it.

11   And that -- that is the bottom card that I pull out of the

12   house of cards and the whole thing comes tumbling down.

13   If they didn't answer the question, Western World would

14   have been in a position to say, oh, this is a renewal insurance

15   application for CNA, but it's an initial application for us.

16   We don't know about your background.  We actually want that

17   question to be answered.

18   And that kind of discussion is very typical with regard to

19   underwriting between broker and underwriting reps.

20   There was no reason to have that inquiry here because,

21   although you could read the question as being voluntary, they

22   went ahead and answered it.  And by so answering it in the

23   negative -- if they had answered it "yes," they would have had

24   to provide a full explain, and it would have fleshed out all of

25   the facts that had been discussed that everybody is in

1    agreement on.

2         But they didn't do that.  And they didn't do that because,

3    if they answered "yes," they would have disclosed all of this

4    information.

5         And it's not a stretch.  You don't you have to be an

6    insurance professional.  Anybody with any kind of a background

7    looking at this tsunami of adverse facts arising out of a

8    Federal investigation against PC, this be rises to the legal

9    standard of you've got to be kidding me, you have got to be

10   kidding me.

11        You would have to be insane as an insurance underwriter to

12   go forward and issue the Western World policy at all.  And if

13   you were, nonetheless, enticed to issue it, to issue it under

14   the same terms and for the same pricing.

15        What could have happened?  Well, I don't know.  Western

16   World, if we're going to play this speculation game, could have

17   gone forward and said, under no circumstances will I issue this

18   policy, which is what the declaration says.  The declaration

19   says, under no circumstances would I issue that policy.

20        Because the conditions here are so egregious and so

21   horrific that the risk is so high that it's toxic, it's

22   radioactive.  And I don't make money writing policies for toxic

23   and radioactive risks.

24        Or, if you want -- if you were really desperate -- and

25   I've seen this many times, Your Honor -- I've been practicing

insurance law for 30-plus years -- I would endorse it off.
Everything having to do with this gets endorsed off the policy;
there will absolutely, under no circumstance be any coverage.
And I would probably charge you a substantially higher
insurance premium because you're a lousy risk.  You're the
assigned-risk auto driver who's had 27 accidents in the last 27
years.  That's why you go to the high-risk boys.

So I really don't think that that argument has any merit
whatsoever, unless you're confounded by the issue that it was
surplusage.  Because they weren't looking to increase the
limits.

And that's why my answer to it is, well, if they hadn't
answered that question, Western World could have gone back and
said, you know, I want that question answered.

Why would they want to do that?  Because it's the standard
question you always ask when you get a new policy.

If you have a renewal situation, that question was asked
in the initial insurance application.  On renewal, I'm sticking
with my policyholder, I know who they are, everything is moving
forward.

They're changing horses.  I don't know why.  But they're
changing horses.

So the question that gets asked is the question that is
asked in virtually every insurance application.  None of the
individuals doing the insured under any coverage part, the

 1   insured person, and the insured persons includes the

 2   whistleblower employees who were telling their cohorts and

 3   telling the president of the company before he signs his

 4   declaration that not only are they involved in illegal

 5   activity, paying bribes to government and financial

 6   institutions to illegally procure employment and financial data

 7   on debtors to use in our illegal debt collection practices,

 8   because you can't do that.  They know all of that.

 9        So the whole idea behind that question is that you go

10   around and ask the people.  Just like I do every year when I

11   renew my malpractice policy, I have to attest under oath to a

12   question that's remarkably similar to this every single year.

13        And we go around and we ask every single attorney in the

14   office:  Are you aware of any circumstances that might give

15   rise to a claim against us?

16        Because if we don't truthfully answer that question, the

17   insurance company is going to move for rescission.  Just as

18   Western World did here.

19        The issue with regard to whether or not -- a lot of the

20   argument that went forward in the second half of Counsel's

21   argument had to go really towards prior-knowledge exclusion,

22   and we would have been insane to have touched this protected

23   class of whistleblower employees.

24        Well, there is an element of irrationality and insanity

25   going through with what PCC did.  And I see it happen all the

1   time.  And I don't buy the standard that just because somebody

2   did something that was irrational or foolhardy means that

3   really they had a different motivation in their mind.

4        THE COURT:  Almost by stating it that way that would be

5   better resolved as an issue for the jury than for the court.

6        MR. WRAITH:  Except that it's not necessary to the

7   rescission issue.  That went to the prior knowledge.  So I'm

8   not really inclined to go address a lot of prior-knowledge

9   exclusionary arguments because we are very happy with the

10  rescission and we want to stay focused on the rescission, Your

11  Honor.

12       They have a view -- Counsel also has suggested that we

13  have to show deceit on the part of Todd Shields, the president,

14  or Mr. Garen -- we didn't argue it in our papers, but Mr. Garen

15  has acknowledged that as general counsel he and the president

16  formulated the responses to the insurance app and signed it.

17       The issue with regard to deceit is unnecessary in

18  California.  I don't have to show your guilty mind.  The issue

19  is simply subjective materiality on the part of insurance

20  company.  Would the insurance company have wanted to know the

21  actual facts?  There's no question.

22       The circumstances of the material misrepresentation on the

23  app are so egregious that it defies belief.  The notion that

24  there's a juror out there that might find that, well, you know,

25  an insurance company would simply ignore that, flies in the

```
 1   face of what we all know.  Which is that if I have a fender
 2   bender or my wife has a fender bender, my auto insurance rates
 3   go up.  Why have we fought so much in health care about prior
 4   conditions?  Because health insurers don't want to touch people
 5   that are sick.  They're toxic.  We all understand that.  Juries
 6   understand that.
 7        I don't see any basis for doing anything other than
 8   adopting the tentative ruling the court has issued today.
 9        THE COURT:  All right.  Thank you.
10        MR. WRAITH:  Thank you, Your Honor.
11        THE COURT:  Obviously, the briefs did a good job of laying
12   out the issues.  The argument --
13        I'm sorry, Mr. Weichert, I have a full courtroom.
14        But I'll consider the arguments.  I do understand,
15   Mr. Weichert, your issue in regard to the discovery deadline.
16        You know, actually, in terms of the 56(d), I made it
17   clear, and I will make it more clear however the final order
18   comes out, that the issue here is whether the discovery is
19   going to be helpful.
20        You know, in the past, I have at times said, look, counsel
21   had plenty of time to raise this discovery, but it's generally
22   been in the context where the intention of the opposing party
23   to move for summary judgment on that precise issue was
24   expressly raised, and there was notice of that.  I have no
25   reason to think that's here.  So I'll keep your arguments in
```

```
1    mind before I issue the final order.
2         MR. WEICHERT:  May I have 30 seconds, Your Honor?
3         THE COURT:  I'm sorry, Mr. Weichert.  I've got a full
4    courtroom.  Thank you.
5              (Proceedings concluded at 10:40 a.m.)
6                        --oOo--
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2

 3

 4

 5        I, NAREN JANSEN, Federal Official Realtime Court Reporter,

 6   in and for the United States District Court for the Central

 7   District of California, do hereby certify that pursuant to

 8   Section 753, Title 28, United States Code that the foregoing is

 9   a true and correct transcript of the stenographically reported

10   proceedings held in the above-entitled matter and that the

11   transcript page format is in conformance with the regulations

12   of the judicial conference of the United States.

13

14   Date:  April 5, 2016

15

16

17                    /s/ NAREN JANSEN
                      _____
18                    NAREN JANSEN, CSR NO. 3827, RMR, CRR
                      Federal Official Court Reporter
19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA